ON RETURN TO REMAND
The appellant, Walter McMillian, was jointly indicted with Ralph Bernard Myers in a two-count indictment on December 11, 1987, in Monroe County, for the offense of murder made capital because it was committed during a robbery in the first degree, a violation of § 13A-5-40(a)(2), Code of Alabama 1975. At his arraignment on December 14, 1987, he pleaded not guilty and moved to sever his case from Myers's and to change venue because of pretrial publicity. His motions were granted. His case was severed from Myers's and it was transferred to Baldwin County for trial. On August 17, 1988, a jury found him guilty of the capital offense charged in the indictment, and he was sentenced to death. Myers, whose case was pending at the time of McMillian's trial, testified for the state, implicating McMillian in the commission of the crime. For a recitation of the facts of the case, see McMillian v. State, 570 So.2d 1285,1287 (Ala.Cr.App. 1990).
On original submission, we remanded the case to the trial court with instructions that that court conduct an evidentiary hearing to determine what, if any, agreements had been made between the state and its witnesses Bill Hooks, Jr., and Myers, that afforded the witnesses any consideration or favors in return for their testimony and cooperation, and if any such agreements had been made, to determine whether that information had been furnished to the appellant before trial or whether the appellant was aware of such information prior to trial. The trial court complied with our instructions and duly filed its return. On re-submission, we affirmed McMillian's conviction and his sentence to death. McMillian v. State, 594 So.2d 1253
(Ala.Cr.App. 1991).
Approximately five months after Myers testified in the appellant's trial, he pleaded guilty to the lesser included offense of robbery in the third degree and was sentenced as a habitual offender to 30 years' imprisonment. After Myers was incarcerated and while McMillian's appeal was pending in this court, Myers recanted his testimony. He told the appellant's trial counsel that his testimony against McMillian was false, that he knew nothing about the crime, that he was not present when the crime was committed, that he had been told what to say by certain law enforcement officers, and that he had testified falsely against McMillian because of pressure from the officers. The appellant then filed a petition in the trial court for post-conviction relief, pursuant to A.R.Crim.P. 32, alleging that a key state witness had recanted his testimony, that the appellant's conviction had been obtained by perjured testimony, and that the evidence of perjury was newly discovered. He also alleged in his petition that the state had violated his constitutional rights by withholding exculpatory and impeachment information required to be disclosed byBrady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963), and Giglio v. United States, 405 U.S. 150,92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
While McMillian's direct appeal was pending in the Alabama Supreme Court on certiorari review, the state, with the agreement of the appellant, moved that this cause be remanded to the trial court for an evidentiary hearing on the Rule 32 petition's allegation that Myers's testimony was perjured and that the trial court's disposition of this issue be considered as part of the direct appeal. The Supreme Court granted the motion and remanded the case to us with instructions to remand the case in accordance with the state's motion. Ex parteMcMillian, 594 So.2d 1288 (Ala. 1992). We remanded the case to the trial court with instructions that that court conduct an evidentiary hearing to determine whether the appellant's conviction was obtained by perjured testimony as averred in his petition, and upon completion of the hearing to make due return regarding all proceedings, along with a transcript of the hearing, to this court. We also instructed the trial court to dismiss the petition after *Page 936 
completion of the proceedings because the disposition of the perjury issue raised in the petition would be considered as part of the instant appeal. McMillian v. State, 594 So.2d 1289
(Ala.Cr.App. 1992).
The trial court conducted the evidentiary hearing as instructed, and, in the interest of judicial economy, properly received evidence on all issues raised in the Rule 32 petition, which included not only the issue of whether the appellant's conviction had been obtained by the alleged perjured testimony of Myers, but also the issue of whether the state had withheld information in violation of Brady and Giglio. Upon completion of the hearing, the trial court held that the evidence was insufficient to prove that Myers had perjured himself at the trial, and it entered its order to that effect. The trial court did not address the Brady and Giglio issues, obviously because of our mistake in inadvertently limiting the trial court's review to the perjury issue only.
In order to avoid further delay and in the interest of judicial economy, we again remanded the case to the trial court by unpublished order on December 14, 1992, with instructions for it to consider the Brady and Giglio issues and to make due return of its findings to this court. The trial court filed its return on January 11, 1993, which reflects its order denying the appellant's Brady and Giglio claims. The order reads, in part, as follows:
 "Evidence was received on these issues and the court finds no credible evidence to support the contentions of defendant. . . . The defendant has failed to provide adequate proof of any intent by the State to deprive him of material to which he was entitled which was known to the state, and his claims under these theories are due to be denied."
The appellant appeals the orders of the trial court denying him the relief sought in his petition, and raises two issues that we will now address.
 I.
First, the appellant contends that he is entitled to a new trial because of newly discovered evidence that the state obtained the appellant's conviction by using perjured testimony. In arguing for a reversal, he relies on Ex parteFrazier, 562 So.2d 560 (Ala. 1989), and on A.R.Crim.P. 32.1(e). This contention is based upon Myers's recantation of his trial testimony.
Briefly, Myers gave the following testimony for the state at the appellant's trial, in return for a promise that he would be permitted to plead guilty to a lesser noncapital offense: On November 1, 1986, the appellant asked him to drive the appellant from Evergreen to Monroeville to "take care of some business." Myers agreed and drove the appellant to Monroeville in the appellant's green Chevrolet truck. Upon arriving in Monroeville, the appellant directed him to park next to Jackson Cleaners, a dry cleaners. The appellant got out of the truck, said he would be back in a minute, and went into Jackson Cleaners. In a short while, Myers heard "popping noises" like firecrackers coming from inside the building, and he got out of the truck and went into the building. He saw the appellant kneeling behind the counter, taking money out of a paper sack, and putting it in a brown "zip-up case." He also saw a young girl lying on the floor. The appellant had a small caliber automatic pistol in his hand. When the appellant saw Myers, he grabbed him and shoved him against the wall and told him that, if he ever said anything about what he had seen, the appellant would kill Myers's wife and children. He heard the voice of another person in the back of the dry cleaners, and he observed a white man with his back toward Myers, carrying in his hand something that looked like a piece of pipe. The appellant ordered Myers to go outside and wait. Myers returned to the truck, and a few minutes later the appellant came out and got into the truck. He was carrying a brown satchel that was "bulging out" and appeared to contain a gun. The appellant ordered Myers to drive away, and they proceeded toward Evergreen. On the way to Evergreen, the appellant told Myers to keep his mouth shut or he would "wind up being dead." *Page 937 
Unquestionably, Myers was the key witness for the prosecution. Without his testimony, the state could not have obtained a conviction. His credibility was the most important issue in the case. The only evidence offered by the state, other than the testimony of Myers, that tended to connect the appellant with the commission of the crime was the testimony of Joe Hightower and Bill Hooks, Jr. Hightower testified that, "sometime up in the morning" on the day that the crime was committed, he passed Jackson Cleaners and saw the appellant's truck "sitting at the cleaners." He stated that he was familiar with the truck and that it was a low-rider type, sporty, and "souped up." He further testified that when he arrived home about noon or 1:00 p.m., his wife told him that she had heard about an incident at the cleaners. Bill Hooks, Jr., testified that he passed the cleaners on the day of the incident "about the middle of the morning" and saw the appellant's truck parked there. He too testified that he was familiar with the truck, and he described it as green, low, and "down to the ground." He testified that he saw Myers in the truck on the driver's side and that he saw the appellant getting into the truck. He stated that the truck "speeded out" and that, about five minutes later, he heard the sirens of the police and an ambulance going to Jackson Cleaners.
The evidence against the appellant was circumstantial. His defense consisted of attempts to cast doubt upon the credibility of the state's witnesses, particularly Myers, and to establish an alibi. The state presented evidence on rebuttal that cast doubt upon the truthfulness of the alibi witnesses. The appellant did not testify.
At the evidentiary hearing on the perjury issue alleged in the Rule 32 petition, Myers testified, in part, as follows:
 "Q. [Defense counsel]: Mr. Myers, was the testimony that you gave at Mr. McMillian's trial true?
"A. Not at all.
 "Q. Did you see Mr. McMillian on the day that Ronda Morrison was murdered?
"A. Absolutely not.
 "Q. Did you drive his truck to Monroeville on that day?
"A. Absolutely not.
 "Q. Did you go into Jackson Cleaners when Ronda Morrison was murdered?
"A. No. Never have.
 "Q. Did you see Mr. McMillian inside Jackson Cleaners?
"A. Never have.
 "Q. Now, at Mr. McMillian's trial, did you give some testimony that there was a white man inside the cleaners when you went inside?
"A. Yes, I did.
"Q. What was that testimony, please?
 "A. As I can recall, the testimony was that I had overheard Walter McMillian saying something to this guy, and I had also recalled saying that I had seen the back part of his head, but that's just about all I recall on that.
"Q. Was that testimony true, Mr. Myers?
"A. No, it wasn't.
 "Q. Were any of the allegations that you made against Mr. McMillian as being involved in the Ronda Morrison murder true?
"A. No.
 "Q. Mr. Myers, why did you testify falsely against Mr. McMillian?
"A. Why?
"Q. Why?
 "A. Well, I'll tell you. I was picked up. I was [taken] to the Monroeville County jail. During that time I was held there, I was up under a lot of pressure, couldn't see my family. I kept telling these people that I didn't have anything to do with the murder of Ronda Morrison. They kept asking me did I have anything to do with Walter McMillian, was Walter McMillian there. Kept asking me all kinds of different questions about did I do this, did I do that. I kept telling them no, no, no. And it seemed like every day the pressure got more and more, worse and worse. And the next thing I knew, it had got so bad till I went ahead and started saying anything they wanted to hear, anything that they said and asked me, 'Well ain't that right' — well, if they *Page 938 
would say something and then turn around and say, 'Ain't that right,' I said, 'Yeah.'
 "Q. Who were the law enforcement officers that were asking you about this incident or questioning you about this offense?
 "A. Mr. Larry Ikner right there. I can't think of some of the other officers, but it was Mr. Larry Ikner, Mr. Thomas Tate, Simon Benson. And well, at different times there was a few more there, too. But . . .
". . . .
 "THE WITNESS [Myers]: Your Honor, if I may, I'd like to say something if it's all right.
"THE COURT: It's okay with me.
 "MR. CHAPMAN [the prosecutor]: I don't have any objection.
 "THE WITNESS: This way we can all get out of this courtroom, and we can let an innocent man go on home if that's what the law will let happen. Me, I can simply look in your face or anybody else's face dead eye to eyeball and tell you that that's all I — anything it was told about McMillian was a lie. I had nothing to do with it. I was up under a lot of pressure from Escambia County, my family, and everyone else. I had so much going on. And then when I was picked up and put over there in that jail that night half drunk, the only thing that was on my mind was my family, what was going on everywhere else around me. And then all of a sudden everyone jumps up and tells me, 'Well, Ralph, you know this is — you know darn good and well that you and McMillian had something to do with this.' And I told everybody no, I didn't have nothing to do with this. No. As far as I know, McMillian didn't have anything to do with this because on the day, on the day they say this happened, I didn't even see McMillian. And that's exactly what I told a lot of people. And there was a lot of times that they was in that office down there, and they kept telling me, 'No, you know you're lying. You know you're lying. You know you're lying.' And they kept on and kept on and kept on. I've never been good up under any pressure from no one."
The appellant presented testimony and documents at the evidentiary hearing supporting Myers's testimony that he had testified falsely. Prior to the appellant's trial, Myers had been sent to Taylor Hardin Secure Medical Facility for a psychiatric examination to determine his competency to stand trial. The hospital records show that, several months prior to the appellant's trial, Myers told four hospital staff doctors at separate times that he was being pressured by police officers to testify falsely against the appellant and that he knew nothing about the crime. The report of Dr. Norman Poythress, prepared on May 10, 1988, three months prior to the appellant's trial, after an interview with Myers, states the following:
 "He stated that after being arrested, he was kept in isolation, he was not allowed to visit or make telephone calls to his family and stated that he did not have attorney representation for several weeks while being kept at the jail. He stated that police officers pressured him on a daily basis to give a statement about a different murder and indicated to him through leading questions the kind of 'statement' that they wanted him to make. He stated that because of this psychological pressure and coercion he eventually parroted back to the officers what they had indicated he should say. In summary, the defendant stated that his prior 'confessions' are bogus and were coerced out of him by the police through keeping him physically and psychologically isolated."
(Emphasis added.) The reports of the other doctors at Taylor Hardin contain almost identical information.
Evidence was presented by the appellant that Myers had made a statement to police officers on June 3, 1987, when he was first arrested, that he had no knowledge of the crime. The state did not disclose this statement prior to the trial. Joe Little, a former inmate at the Monroe County jail, testified that Myers had told him, prior to the trial, that he was going to testify falsely against *Page 939 
the appellant. The appellant also introduced evidence showing that Myers had made statements to others, prior to the trial, that he was going to falsely accuse the appellant of another, unrelated crime.
Evidence was produced showing that Miles Jackson had told the police during their investigation that he had entered Jackson Cleaners at 10:30 a.m. on the day of the murder; that Ronda Morrison, the victim, was alive at that time; and that everything was normal. Jackson, who had formerly owned the cleaners, seemed certain of the time and related it to a bank deposit that he had made nearby. The state did not use Jackson as a witness at trial and did not disclose his statement to the appellant prior to trial. The state theorized that the crime occurred during a 30-minute period between 10:15 and 10:45 a.m. Jackson's testimony would have cast doubt on the state's theory and on Myers's testimony.
Two mechanics, Willie Nettles and Clay Kast, testified that they had modified the appellant's truck to convert it to a low-rider and that they did not do this work until several months after the commission of the crime at Jackson Cleaners. This testimony casts doubt on the credibility of Hightower, Hooks, and Myers. No reason was advanced by the appellant as to why these witnesses were not called at the appellant's trial.
The state presented evidence to contradict the testimony offered by the appellant to the effect that his statement had been coerced and that the details of that statement had been supplied by the interrogating officers. Simon Benson, a state investigator, denied pressuring Myers in any way to get him to implicate the appellant in the crime, and he denied suggesting any facts about the case to Myers. Moreover, a taped telephone conversation between Myers and Benson, in which Myers incriminates the appellant, does not support Myers's contention that the officers and particularly Benson suggested facts of the case to him or told him what to say. In the telephone conversation, it appears that Myers is attempting to negotiate a deal for himself in return for evidence against the appellant.
Testimony was also introduced particularly to rebut Myers's testimony that he had told his attorney, George Elbrecht, prior to appellant's trial that he did not want to testify against the appellant because he would be lying. Elbrecht testified, denying that Myers had made such a statement to him. Elbrecht also refuted Myers's testimony that he had been reluctant to testify when the appellant's case had first been called for trial because he did not want to lie. Elbrecht testified that Myers had told him at the time that his reluctance was due to his fear of the appellant and his concern with the sentence that he (Myers) would receive. Elbrecht expressed the opinion that Myers balked in order to negotiate a better deal for himself.
There was evidence that Myers was under pressure in prison to recant his testimony. He testified that he had been told by the prison authorities that there was a "contract" on his life. While he claimed that he understood that the "contract" was from a Conecuh County law enforcement officer in reference to an "unsettled matter," it is reasonable to infer that he had some concern about the appellant who had been sentenced to death as a result of his testimony.
Finally, evidence was presented to the effect that since the appellant's trial, Myers has met with Al Lornimack, an FBI agent, on at least three occasions, giving information of alleged wrongdoing by law enforcement officers involving matters not related to this case, and that on those occasions Myers did not tell the agent that he had been pressured by the Monroe County officers to testify against the appellant nor did he tell the agent (when he had an opportunity to do so) that he had committed perjury. Myers also had an opportunity to tell his probation officer, in a post-sentence interview about his alleged perjury, but he did not do so.
Upon conclusion of the hearing, the trial court entered the following order:
 "This matter came before this Court on a remand from the Supreme Court to *Page 940 
consider the issue of whether the State's princip[al] witness, Ralph Myers, perjured himself at trial of the case in chief, which resulted in the conviction and sentence of death for the Defendant.
 "While this matter was pending, the defendant also filed a Petition under Rule 32, Alabama Rules of Criminal Procedure, and it appeared to the Court to be in the interest of judicial economy for this Court to take such evidence as the parties may wish to provide on each of the four issues raised in the Rule 32 Petition; however, this Court's mandate was to determine, if possible, whether Ralph Myers had perjured himself. The other issues are not before this Court for decision at this time.
 "In attempting to determine whether it is more likely than not that the State's princip[al] witness, Ralph Myers, perjured himself at trial, this court has considered the evidence produced by the parties and has considered those areas from the trial transcript as indicated by the parties as being relevant.
 "Ralph Myers took the stand before this Court, swore to tell the truth and proceeded to recant most, if not all, of the relevant portions of his testimony at trial. Clearly, Ralph Myers has either perjured himself at trial or has perjured himself in front of this Court.
 "The following areas of concern were considered in reaching this decision: The demeanor of the witness; the opportunity of the witness to have knowledge of the facts which he testified to at trial; the rational[e], as stated by the witness, for his testimony at the first trial; the rational[e], as stated by the defendant, for his recantation; the evidence of external pressures brought to bear on the witness prior to and after both trial and recantation; the actions of the witness that lend credence to his trial testimony and the actions of the witness that lend credence to his recantation; evidence adduced at trial in contradiction of the witness' testimony on details; and due to the nature of this case, any evidence from any source concerning the inability of the witness to have known the facts to which he testified to at trial.
 "Since the trial of this matter was conducted before the Honorable R.E.L. Key, Circuit Judge, Retired, this court did not have the opportunity to compare the demeanor of the witness during trial testimony and his recantation testimony.
 "A review of the other factors set out above does not provide conclusive evidence that the witness, Ralph Myers, perjured himself at the original trial. There is ample evidence that pressure has been brought to bear on Ralph Myers since his trial testimony which would tend to discredit his recantation. There is absolutely no evidence in the trial record or the recantation testimony that places Ralph Myers somewhere other than the scene of this crime at the time it was committed.
 "This cause having been remanded to this Court for a determination of whether there is evidence to support the theory that Ralph Myers perjured himself at the original trial and this court having determined that there is insufficient evidence to support that theory, it is therefore
 "ORDERED, ADJUDGED and DECREED that the trial testimony of Ralph Myers is not found to have been perjured testimony."
In Ex parte Frazier, 562 So.2d 560, 570 (Ala. 1989), the Alabama Supreme Court announced the standard to be used in cases in which the death penalty is imposed in deciding whether to grant a motion for a new trial where a new trial is sought on the ground of perjured testimony:
 "In order to grant a motion for a new trial alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; and 3) that the movant is not relying on evidence of which he was not aware at trial and which he consciously decided not to use to challenge the testimony of the perjured witness." *Page 941 
See also Hays v. State, 599 So.2d 1230 (Ala.Cr.App. 1992). With regard to the standard, "a presumption of correctness will continue to be indulged in favor of the trial court's factual findings, and the trial court's ruling on the motion will be upheld on appeal unless it is clearly erroneous." 562 So.2d at 570.
As noted above, there was evidence to support Myers's testimony at the hearing on remand when he recanted his trial testimony. He told others before trial that he was being pressured and that he intended to testify falsely. He unquestionably told this to the doctors at Taylor Hardin Secure Medical Facility. His early statement to the police denying knowledge of the crime, and the testimony of Jackson and the two mechanics who modified the appellant's truck tend to support the truthfulness of his recantation.
On the other hand, there was evidence to the contrary. Myers's attorney and the officers refuted much of his testimony. The failure of Myers to disclose his alleged perjury to disinterested people when he had numerous opportunities to do so weighs against him. The reasonable inference that Myers was under some pressure to recant his trial testimony, the implausibility of his reasons for deciding to disclose his perjury, the colloquy between Myers and the trial court when he entered his guilty plea, and the failure of the taped telephone conversation to support his testimony also must be weighed against him. And finally, the detailed and plausible testimony of Myers at trial that stood up under vigorous cross-examination, and the testimony of Hightower and Hooks, who were also subjected to exhausting cross-examination, cast doubt upon Myers's recantation.
We consider this conflicting evidence in the context of the presumption of correctness to be accorded the trial court's findings and ruling. "The credibility of the witnesses is for the trier of fact, whose finding is conclusive on appeal."Collins v. State, 412 So.2d 845, 846 (Ala.Cr.App. 1982). We cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses. Id. Under the circumstances here, this was the trial court's determination. After reviewing all of the evidence, we cannot say that the trial court's ruling is clearly erroneous. There is ample evidence to support the trial court's findings and ruling. Hence, its findings that Myers's testimony at the appellant's trial was not false and that Myers did not perjure himself at the trial must stand.
 II.
The appellant next contends that his due process rights were violated by the state's failure to disclose exculpatory and impeachment information. He argues that the state violated the rules established in Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States,405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and that, as a result, he is entitled to a new trial.
Prior to trial, the appellant moved for an order requiring the state to produce, inter alia, "[a]ll evidence in the prosecution's possession or available to the prosecution which is favorable to the defendant on the issue of guilt"; "[a]ny and all other information respecting any prosecution witness which is favorable to the defendant on the issue of guilt"; and "[s]tatements made by any persons which are exculpatory with respect to this defendant." The trial court ordered the state to produce "[a]ny evidence tending to exculpate the Defendant from guilt."
The state responded by making available to the appellant's trial counsel items from the prosecutor's file, which included forensic information, photographs, and two inculpatory statements made by Myers to the police and dated June 9 and September 14, 1987. While these two statements are not part of the record, it appears that the statements taken together mirrored Myers's testimony at trial, except that in the first statement he did not tell the officers that he went inside the cleaning establishment after hearing the shots, but in the second statement he did.
The appellant discovered after his trial that certain information had not been produced, *Page 942 
and he contends that the state's failure to produce that information violated Brady and Giglio. According to the appellant, this information consisted of the following: The tape-recorded statements given by Myers to the police on March 16, June 1, and June 3, 1987; a tape-recorded statement of Isaac Dailey taken on August 27, 1987; a police report concerning Miles Jackson, and information in the records of the Taylor Hardin Secure Medical Facility. We will discuss each of these items in the order that they are addressed in the appellant's brief.
We begin our analysis with a brief summary of the controlling authorities. In Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." A Brady violation occurs where: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial. Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990); Delap v. Dugger, 890 F.2d 285 (11th Cir. 1989);United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.), cert. denied, 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed.2d 256
(1983); Ex parte Kennedy, 472 So.2d 1106, 1110 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). The Supreme Court of the United States in United States v. Bagley,473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), defined the standard of materiality required to show a Brady
violation as follows: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." See also Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989,94 L.Ed.2d 40 (1987) (quoting United States v. Bagley,473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (plurality opinion by Blackmon, J.)); Stano v. Dugger, 901 F.2d at 899;Delap v. Dugger, 890 F.2d at 299; Coral v. State, [CR-89-1117, March 27, 1992], 1992 WL 95083 (Ala.Cr.App. 1992); Thompson v.State, 581 So.2d 1216 (Ala.Cr.App. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). The same standard of materiality and the same due process requirement apply whether the evidence is for exculpation or for impeachment.United States v. Bagley; Giglio v. United States; Ex parteWomack. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within the general rule." Giglio v.United States, 405 U.S. at 154, 92 S.Ct. at 766 (quoting Napuev. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177,3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when the evidence would tend to exculpate the accused or to impeach the veracity of a critical state's witness.
 A.
On June 3, 1987, Myers was arrested for the murder of Vicky Lynn Pittman. This murder had occurred in neighboring Escambia County and is unrelated to the crime charged in the instant case. He was interrogated on that date by Simon Benson, a state investigator; Sheriff Tom Tate of Monroe County; and Larry Ikner, an investigator with the district attorney's office in Monroe County, all of whom were in charge of the investigation of the murder-robbery of Ronda Morrison at the Jackson Cleaners in Monroe County. They questioned Myers at length about both the Pittman and Morrison killings, and tape-recorded the questions and answers. In response to questions directed to him about the Morrison killing, Myers vigorously denied any knowledge of the crime, requested a lie detector test, and invited the officers to investigate his whereabouts on the day of the crime.
We quote portions of this statement as follows:
 "Q: [Simon Benson]: Now, I want you to level with me about Ronda Morrison, *Page 943 
the girl that was in the cleaners that was killed.
"Q: Listen up to me before you say anything.
"MYERS: Huh.
"Q: Over here.
 "Q: All right. I told you that you have a choice as [to] whether or not you want to be tried capital murder, which you would get the electric chair, they would give you the death penalty for that, or whether you want to be charged with murder and go to court on the murder charges. One murder, two murder, three murder, it's the same thing.
"MYERS: That's right.
 "Q: . . . involving the same plan, the plan [Vicky] Lynn Pittman and Ronda Morrison are the same, the same people's involved, the same person that rape[d] you, that had [Vicky] Lynn Pittman killed is the same one, [giving it straight up], is the same one, the same gun that was used to kill Ronda Morrison. I know that. Now, I been a man with you ever since you been here. You told me that you wanted your family protected, you told me that you wanted to do the right thing, and get all this behind you. You told . . .
"MYERS: That's right.
"Q: . . . me you want to do that.
"MYERS: That's right.
 "Q: Ok, I'm here today for you to do that. I'm here for you to correct the mistake that have happened to you by being raped, the mistake that happened to you by being involved with the people formed together. You got involved involuntary, you was forced into it, from what you tell us. During the time, the same way that [Vicky] Lynn Pittman was killed, and the reason Ronda Morrison was killed. . . . Ralph, time is not important. I'm putting my watch off, it's not important. If we have to bring some food in, we'll bring some food in or whatever, ok? If we need coffee, if we need water, whatever. But I want the details of Ronda Morrison's death. I can tell you what caused the death: she was shot. I want, from the start to the finish, why Johnny D. [When Myers uses the name "Johnny D," he is referring to the appellant.] had you kill Ronda Morrison.
 "MYERS: I didn't kill Ronda Morrison. And Johnny D. didn't get me to kill Ronda Morrison.
"Q: Did you kill her on your own?
 "MYERS: I did not kill Ronda Morrison period, Mr. Simon.
 "Q: Ok. So you don't deny that Johnny D. gave you a. 25 automatic that he had to kill Ronda Morrison.
 "MYERS: Johnny D. has never given me a .25 automatic. He has never given me no gun, period. The only thing that he ever done for me was slap the hell out of me, and rape me and beat the hell out of me and bounce me off my truck.
 "Q: Well, would you face anyone in the world today that you know exists in the world and sit or stand and look them in the eyes and tell them that they do not know for a fact that Johnny D. had you to kill . . .
"MYERS: You're damn right, I yes sir . . .
"Q: . . . Ronda Morrison.
"MYERS: . . . Mr. Simon, I would.
 "Q: Listen, let's, let's finish, let's, let's understand, ok. What you said, no one can put you at the cleaner when Ronda Morrison was killed . ..
 "MYERS: (over Benson) No, sir, I was not at no cleaner.
 "Q: Ok, nobody can say Johnny D. gave you a .25 automatic to kill Ronda Morrison. Nobody can say that, right?
 "MYERS: Nobody, they can say it, but it wouldn't be true.
"Q: Ok, nobody can prove it, right?
 "MYERS: And it wouldn't be true, I guarantee you that.
 "Q: Nobody can prove that, right? That's what you said.
 "MYERS: Now, Simon, there's no way that, that anybody can prove anything that hasn't happened.
 "Q: Nobody can prove it, ok, I just wanted to understand, get, get what you said about it. Ok, no one can prove. *Page 944 
 "MYERS: The only thing that I knowed about was what I told y'all the other night, and that I had went ahead, and got, so got, got p'd off at Johnny D. one night down there and made the accusation to him about being involved, about Karen [Kelly] and him being involved in the shit over here too.
 "Q: Ok, all right, so when you made the statement that [Vicky] Lynn Pittman is not the onliest girl that you been involved with that was killed and that you was paid to do it, then that was a lie.
"MYERS: That's right.
"Q: You, you only said it for a bluff.
"MYERS: What you mean?
 "Q: You only said that I killed [Vicky] Lynn, uh, killed Ronda Morrison as a bluff.
"MYERS: What do you mean by that?
 "Q. Ok, there was two witness at the Walker house when you [were] sitting out talking and reference Ronda Morrison that said you, out of your own mouth, said [Vicky] Lynn Pittman is not the onliest girl, you killed Ronda Morrison. You said that for a bluff.
 "MYERS: I'm gonna tell you something: Nobody has said that period, whoever has told you that is telling a stone damn lie, Mr. Simon.
"Q: Ok, and you will . . .
"MYERS: (over Benson) I will tell it right.
"Q: . . . you will face the person . . .
"MYERS: Right.
 "Q: that have been involved with you in some burglaries and also been involved with you in other illegal activity, you will tell this person . . .
"MYERS: That's right.
 "Q: . . . that the statement that I just made, that it was only made as a joke and not as . . .
 "MYERS: I ain't never said nothing like that, period.
"Q: All right.
 "MYERS: That's what I'm trying to tell you, because I'm gonna be honest with you, I really didn't know a damn thing. All that I had heard through Mike Cain over in Brewton and I had, the first time I had ever heard it, about any girl being killed over here was through my boss man, and I give Mr. Clyde Cosy his address, telephone number, and everything yesterday . . .
"Q: Ok.
"MYERS: . . . when he carried me over to Brewton.
 "Q: And you would take a polygraph to the fact that you did not shoot Ronda Morrison in the dry cleaners.
"MYERS: That's right. Yes sir, I certainly will.
 "Q: That you never had Johnny D.'s magnum or .25 automatic.
"MYERS: That's right. I will. I, I sure will.
 "Q: That you do not know who killed Ronda Morrison.
"MYERS: That's right.
"Q: You would take a polygraph.
"MYERS: That's right.
 "Q: You will face the person that can testify to the fact that you told them personally that you killed . . .
"MYERS: I will . . .
"Q: Ronda Morrison for Johnny D. McMillian.
 "MYERS: I will face any damn body in this world on that, 'cause it's a stone lie. Can I get some water?
 "[some mumbling; sounds like Ralph's liable to get tired.]
 "Q: I'm gonna tell you what, Ralph, there's more than one that has said it.
 "MYERS: I don't care who the hell said, I told y'all the truth of it."
 "Q: So it's basically come down to you'll take a polygraph test in reference to the death of Ronda Morrison . . .
"MYERS: Yes sir, I will.
 "Q: . . . that you did not have anything to do with it . . .
"MYERS: That's right.
 "Q: . . . that, that robbed money that you say came out of the cash register. What I am saying you said is the fact that people that give a statement that *Page 945 
said that you made the remark that it was only a small amount of money. Karen never mentioned in your presence how much money came out of the cash register?
"MYERS: I'm gonna tell you something —
"Q: Have she?
"MYERS: Nuh-uh.
"Q: She hasn't told you?
"MYERS: Uhh —
 "Q: Ok, have anyone told you how much money was taken?
 "MYERS: Mr. Gordon Mosley had, uh, told me the same damn day that, uh, me and him was working that he had heard about a girl over here being killed, but he didn't know, uh, all what was tooken. He didn't know well if it was, you know, what the hell was tooken, but he did kn-, he did know there was a girl here killed.
 "Q: And he knew there was some money taken out of the cash register?
 "MYERS: He didn't say anything about the money. He, he, you know, the only thing I asked him, I said, 'Well, why they kill her?' I said, 'Was it a robbery or what?' Mr. Mosley said, 'I don't know,' he said, 'I don't know what they took, or, you know, if they took anything or not.' "
 "Q: Well, I tell you what you better do, you better plan to subpoena them people, and let your lawyer find out, 'cause you're fixing to be hung up on two capital murder cases. Because we've already got witnesses putting your ass in on both of them.
 "MYERS: I'm gonna tell y'all the truth, and y'all won't believe me —
"Q: Shit, I don't believe you, Ralph . . .
"MYERS: Well, that's fine.
"Q: . . . I don't believe you worth a damn.
"MYERS: Ok.
"Q: Now, Simon might believe every word of it.
 "MYERS: Well, that's if Mr. Simon don't, that's fine, too. I told y'all the truth, and, uh, you know . . ."
 "Q: Well, we do Ralph. We've got witnesses putting you these places. Number one, we've got witnesses putting you out here at this dry cleaners killing Ronda Morrison. Number two, we've got witnesses putting you over in Evergreen when you first started the killing of [Vicky] Lynn Pittman, and wound up killing here in Escambia County, down in the Brooklyn community. Now, you can't tell us where you were, but then we can tell you where you were.
"MYERS: Well, I can put it this way.
"Q: You put it any way you want to.
 "MYERS: Y'all can believe what you want to believe, but I can tell you this much: Simon Benson, I'm gonna tell you something right to your face, and you, too, Larry [Gunt?]. Y'all asked me the other night for the truth. My God, I gave you the truth. Now, that was the truth, what I told y'all just a little while ago was the truth, and that's all I got to say, and y'all want the truth, y'all told me to be honest with y'all, I give it to you.
"Q: Ok.
 "MYERS: Now, it's y'all's prerogative if you want to get out here and believe a bunch of goddamned dope pushers that's been dope pushing nothing but half their life to start off with, and, and, uh, damn rogues and murderers, fine, y'all go believe them, but I'm gonna tell you something right now. I did not have nothing to do with Ronda Morrison's death, . . ."
This taped statement of June 3, 1987, was not disclosed by the state prior to the appellant's trial. The appellant discovered its existence during post-conviction proceedings. The question presented here is whether the state's failure to disclose to the defense this statement, which we conclude was requested, amounts to a violation of due process, thereby vitiating McMillian's conviction. While Myers's statement of June 3, 1987, was not specifically requested, we construe the appellant's request as sufficient to have put the state on *Page 946 
notice to produce all exculpatory and impeachment information in its possession.
No reasons are advanced by the state as to why the statement was not produced. Whether the prosecutor personally knew of the existence of the statement is immaterial under these circumstances. The knowledge of the investigating officers who took the statement is imputed to the prosecutor. Duncan v.State, 575 So.2d 1198 (Ala.Cr.App. 1990), cert. denied,575 So.2d 1208 (1991). It can hardly be argued that the prosecutor had no knowledge of the statement since his own investigator, Ikner, was one of the officers conducting the interrogation. We conclude that the prosecution suppressed the statement.
The June 3 statement clearly contains evidence that is favorable to the appellant and that is both exculpatory and impeaching of a crucial state witness. The statement was material to the appellant's defense. It was totally inconsistent with the witness's trial testimony. It certainly would have been valuable in the cross-examination of Myers, because it not only could have cast doubt on his credibility, but it also could well have been important to the jury in passing on the guilt or innocence of the appellant. The jury was entitled to know of it. As we have heretofore pointed out, Myers's credibility was the most important issue in the case. There was much about Myers to indicate unreliability, and without his testimony the evidence would have been insufficient to allow the case to go to the jury.
The prosecutor's closing argument to the jury considerably aggravated his failure to disclose Myers's statement because he argued that Myers was believable since he told the same story from the beginning, when in fact unbeknownst to the defense, he had not told the same story from the beginning. Viewing the record in its entirety, we conclude that there is a reasonable probability that had Myers's prior inconsistent statement been disclosed to the defense prior to trial, the results of the proceedings would have been different. A reasonable doubt might well have been created. Confidence in the outcome of the proceeding has definitely been undermined. Accordingly, the prosecutor's failure to disclose Myers's June 3 statement denied the appellant due process, requiring us to reverse the conviction and death sentence and to remand the case for a new trial.
 B.
The appellant contends that he was denied due process because of the state's failure to disclose a tape-recorded statement of Issac Dailey, which contains information that could have been used to attack Myers's credibility. On August 27, 1987, Simon Benson, a state investigator involved in the investigation of the murder of Ronda Morrison as well as that of Vicky Lynn Pittman, obtained a statement from Dailey concerning Pittman's murder. Dailey had been arrested in connection with the Pittman murder. Dailey stated that while he and Myers were incarcerated in the Monroe County jail, he overheard Myers say, in the presence of other persons whom he named, that he and Karen Kelly had killed Pittman and that they were plotting to blame the killing on the appellant, McMillian.
We find that this statement was suppressed by the prosecution, that it was favorable to the appellant, that it was material, and that it should have been disclosed in response to the discovery order. The information that the state's key witness, Myers, was willing to frame the appellant for a murder that he did not commit, but that Myers had committed, would have cast grave doubt upon Myers's credibility. We believe that there is a reasonable probability that had the Dailey statement been disclosed, the results of the proceedings would have been different. Confidence in the outcome of the trial is again undermined. We find that the suppression of this statement, like the June 3, 1987, statement of Myers, constituted a denial of due process, requiring reversal of the conviction and a new trial.
 C.
The appellant contends that he was denied due process because of the state's *Page 947 
failure to disclose the exculpatory statement of Miles Jackson. The state contended at trial that the crime was committed during a 30-minute period between 10:15 and 10:45 a.m. The state presented a witness who testified that, when she was in the cleaning establishment at 10:15, Ronda Morrison, the victim, was alive and well and apparently alone. The next witness presented by the state testified that, when she entered the cleaners at 10:45, Morrison was not there. A short time later her body was discovered under some racks of clothing in the establishment. The prosecutor argued to the jury that there was ample time during this 30-minute period for the events, as related by Myers, to have occurred. The defense argued to the contrary, questioning the plausibility of Myers's account of what happened in a 30-minute period. Thus, the theory of the state's case that the crime occurred in a 30-minute time frame, 10:15 to 10:45 a.m., became an important issue in the case.
During the investigation of the case, Miles Jackson, a former owner of the cleaning establishment, came forward and told the investigators that he had entered the cleaning establishment at 10:30 a.m. and that Morrison was alive and alone. He had made a bank deposit at a nearby bank before entering the cleaners and had concluded that he was in the cleaners at 10:30 a.m., by referring to the time he made that bank deposit. Jackson was given a polygraph test. The state offered no reason why such a test was given, nor does the record show the results of the test. A report prepared by the Alabama Bureau of Investigation on October 7, 1987, makes the following references to Jackson: "Witness MILES JACKSON stated that he was in the cleaners at 10:30 a.m. and that [RONDA] MORRISON was alive and that there was no one else in the cleaners" and "In cleaners at 10:30 A.M. Last person to see victim alive." The state did not call Jackson as a witness at trial.
The appellant's trial counsel contend that they never learned about Jackson prior to trial, and that they only learned of him during post-conviction proceedings when they became aware of the Alabama Bureau of Investigation report. However, Benson testified that, approximately one week prior to trial, a meeting was held with the prosecuting attorney and with the appellant's trial counsel for discovery purposes. He stated that he took the report in question from his file and handed it to the prosecutor, who in turn handed it to one of the appellant's counsel. The prosecutor testified that he told the investigators to let defense counsel look at the file and that he then left. He stated that he could not say who gave defense counsel the report. The prosecutor stated:
 "A. . . . I just remember going in Larry's office. Everybody was in there, and they asked me would it be all right or something like that. And I looked at the big file, and I said — I think I asked Mr. Benson, I said — the normal file. They make it on every case. I said, 'Let them look at it. Make a copy if they want it.' And I left. I had other things to do. What happened then, I couldn't tell you.
 "Q. [Appellant's counsel] You can't say who gave what to whom?
 "A. I couldn't tell you other than I just told them to do it."
The appellant's counsel stated that they did not receive the report while the state witnesses could not positively say that the report was delivered to counsel.
We conclude, after reviewing the record, that it is highly unlikely that the information concerning Jackson was disclosed to the appellant prior to trial. It is illogical to think that the defense would not have called Jackson had it known of his existence. Our review leads us to conclude that the report that contained the information about Jackson was suppressed by the state. Jackson's information was clearly exculpatory and impeaching. His testimony would have contradicted the state's theory as to the time the crime was committed and would have cast doubt upon Myers's testimony. In our opinion, Jackson's statement was material. Had the jury heard his testimony, there is a reasonable probability that the results of the proceedings would have been different. Confidence in the outcome of the trial is again undermined. The *Page 948 
failure of the state to disclose the existence of Jackson and of his statement violated the appellant's due process rights, also requiring reversal of the conviction in this case.
 D.
The appellant contends that the failure of the prosecutor to disclose the records from the Taylor Hardin Secure Medical Facility that disclose that before trial Myers told four doctors at the facility on separate occasions that he was being pressured by the police to testify falsely against the appellant and that he had no knowledge of the crime denied him due process and a fair trial. We agree with the appellant that the reports contained exculpatory and impeachment information that would have been useful to the defense at trial. Prior to Myers's guilty plea and to McMillian's trial, the trial court had ordered that Myers be evaluated at the facility to determine his competency to stand trial. After the evaluation, a report on Myers's competency was sent to the clerk of the Monroe County Circuit Court pursuant to § 15-16-22, Code of Alabama 1975. The report contains, inter alia, the following statements: "Mr. Myers essentially denied any involvement in the alleged offense and thus challenges the alleged facts of his involvement in the case" and "he believes that he has been framed." By the authority of § 15-16-22(c), the report was placed on file in the Monroe County Circuit Clerk's office and was accessible to the district attorney. Clearly the statements in the report filed in the clerk's office were favorable to the appellant and material to the key issue at trial, i.e., the credibility of Myers. We further find that the prosecution suppressed this evidence. At the very least, defense counsel should have been given the impeaching statements from the report and thus have been given the opportunity to investigate Myers's statements at the facility. Again, our confidence in the proceeding's outcome is undermined, and we conclude that the appellant was denied due process.
 E.
Finally, the appellant contends that the failure of the prosecutor to disclose prior to trial the tape-recorded statements of Myers dated March 16 and June 1, 1987, denied him due process.
On March 16, Myers was questioned by police officers of the City of East Brewton and by the Escambia County Sheriff's Department. The interrogation was tape-recorded. The questioning concerned the Vicky Lynn Pittman murder. The Morrison case was not mentioned. The statement consists mainly of information that Myers had ostensibly obtained from Karen Kelly and Issac Dailey about the Pittman case and was passing on to the officers in Escambia County. We do not find any evidence in this statement that would have been favorable to the appellant, nor do we find that the statement was suppressed because it was in the possession of the officers of an entirely different jurisdiction. It was not shown that the Monroe County prosecutor had any knowledge of the statement. The prosecutor should not be charged with the suppression where the undisclosed evidence was in the possession of an officer or agency in another jurisdiction. See Hays v. State,599 So.2d 1230 (Ala.Cr.App. 1992); Demps v. Wainwright, 805 F.2d 1426
(11th Cir. 1986), cert. denied sub nom. Demps v. Dugger,484 U.S. 873, 108 S.Ct. 209, 98 L.Ed.2d 160 (1987); State v. Giles,239 Md. 458, 212 A.2d 101 (1965), vacated on other grounds,386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), conformed to,245 Md. 342, 227 A.2d 745 (1967).
On June 1, Myers was questioned by Larry Ikner and Simon Benson. This statement was tape-recorded and was not disclosed in response to the court's discovery order.[1] The information in the statement concerns only the Pittman case. In the statement, Myers implicates the appellant and Karen Kelly in the murder of *Page 949 
Pittman. He does state that the appellant threatened to kill him. While the evidence of the threat would have been useful in the cross-examination of Myers to show bias and a possible motive for testifying falsely, we do not think that this information, standing alone, is material. There is no reasonable probability that the results of the proceedings would have been different had the jury known of this threat. The failure of the prosecutor to disclose the statement of June 1, 1987, does not constitute a violation of the appellant's due process rights.
For the reasons set out in parts II-A, B, C, and D of this opinion, we conclude that the state suppressed exculpatory and impeachment evidence that had been requested by the defense, thus denying the appellant due process of law, requiring the reversal of his conviction and death sentence, and the remand of the case for a new trial.
REVERSED AND REMANDED.
All Judges concur.
[1] This statement discloses that two prior tape-recorded statements to Ikner and Benson were taken from Myers; however, the prosecutor did not produce them nor does he offer any explanation of what happened to them or what they concerned.