[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 330 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 331 
The appellant, Anthony Tyson, was convicted of three counts of murder in the deaths of Derek Cowan and Damien Thompson. The murders were made *Page 332 
capital because they occurred during the course of a robbery and involved the killing of two or more people during one act or pursuant to one scheme or course of conduct, see of §§ 13A-5-40(a)(2) and 13A-5-40(a)(10), Code of Alabama 1975. The jury, by a vote of 10 to 2, recommended that Tyson be sentenced to death. The trial court accepted the jury's recommendation and sentenced Tyson to death by electrocution.
On appeal, Tyson does not question the sufficiency of the evidence; therefore, we will give only a brief rendition of the facts. The State's evidence tended to show that on January 4, 1997, Porter Key, an employee of Henry Trucking Company, was driving on Franklin Road in Macon County when he discovered the body of Derek Cowan in the middle of the road. Key saw a green Acura automobile roll off the road and strike a fence. The car then backed up onto the road and sped off in the direction of Tuskegee. He thought that the driver of this car had been involved in a hit-and-run accident so he followed the car. He was unable to keep up, and he lost the car somewhere in Tuskegee. Cowan had not been the victim of an accident, but had been shot twice in the back of the head. Within minutes after Key discovered Cowan's body, the body of Damien Thompson was discovered slumped forward in the passenger side of an Acura automobile that was in the bushes at the intersection of Bull Avenue and Anona Street in Tuskegee. Thompson had been shot twice in the head.
Alphonso Cardwell testified that he and Cowan were scheduled to meet for a drug exchange on a dirt road off County Road 36 on January 4, 1997. He testified that as he was driving to the designated location he saw Cowan, Thompson, and a third male, whom he identified at trial as Tyson, drive by in a green Acura. The Acura was being followed by another vehicle driven by Cornelius Drisker. Cardwell arrived at the location and Cowan and Cardwell made the exchange. Cardwell testified that he gave Cowan $300 in exchange for cocaine. Minutes after the drug exchange, Cowan's body was discovered. Witnesses testified that one of his pockets was turned inside out. The $300 was missing.
Police connected Tyson to the murders while investigating a shooting in Union Springs that occurred 10 days after the double murder in Macon County. Nicholas Martin testified that Tyson and three other people shot at him from a car as he was walking his dog. He testified that he recognized Tyson and that he went to the police station and signed a warrant for his arrest.[1] The gun identified as the gun used in the Union Springs shooting was the murder weapon in the double murder.
Numerous forensic evidence connected Tyson to the double murder. After executing a search warrant on Tyson's apartment, based on evidence obtained in the investigation of the Union Springs shooting, police recovered a Lorcin chrome .380 pistol and bloodstained Nike brand sneakers. A DNA analysis of the blood on the sneakers revealed that the blood matched Thompson's blood. Tyson's fingerprints were also recovered from the green Acura. Spent shell casings recovered from the Acura, near Cowan's body, and from the Union Springs shooting were identified as having been fired by the same gun, a Lorcin .380, which was identified as being Tyson's. *Page 333 
Tyson's defense at trial was that he did not kill Cowan and Thompson. He attempted to connect a third person to the killings — — the man who had been seen in a car with the victims earlier on the day of the murders. Tyson attempted to show that this other person could have committed the murders.
 Standard of Review
Tyson has been sentenced to death; therefore, this Court's standard of review is governed by the plain-error doctrine, i.e., this Court will review an issue on appeal even if the issue was not first presented to the trial court. See Rule 45A, Ala.R.App.P., which states:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Error is "plain" if "the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd,603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925 (1993). Also, "[T]he plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1,15, (1985), quoting United States v. Frady, 456 U.S. 152, 163 (1982). To find plain error "the claimed error [must] not only [have] seriously affected [the defendant's] `substantial rights,' but . . . it [must have] had an unfair prejudicial impact on the jury's deliberations." Young,470 U.S. at 18 n. 14.
The Courts of this State have been reluctant to reverse a capital conviction solely on plain error, and have done so only in specifically egregious situations, i.e., when a prosecutor made a direct comment on an accused's failure to testify, see Powell v. State, 631 So.2d 289
(Ala.Cr.App. 1993); when the state illegally introduced evidence, in the guilt phase, indicating that the defendant had committed three prior uncharged violent acts, see Ex parte Woodall, 730 So.2d 652 (Ala. 1998), on remand, 730 So.2d 666 (Ala.Cr.App. 1999); and when a prosecutor, in the sentencing phase, commented on the result of the defendant's previous trial for the same offense, see Hammond v. State, 776 So.2d 884
(Ala.Cr.App. 1998).
 I.
Tyson initially argues that the evidence discovered in his apartment should have been suppressed because of various defects alleged in the search warrant and the supporting affidavit. The record reflects that a search warrant was executed on Tyson's apartment as a result of an investigation into the Union Springs shooting. A search of Tyson's apartment revealed bloodstained sneakers, a shotgun, and a Lorcin .380 pistol.
 A.
Tyson argues that the evidence is due to be suppressed because the search warrant did not specifically authorize a nighttime search pursuant to § 15-5-8, Code of Alabama 1975, and Rule 3.10, Ala.R.Crim.P. Section 15-5-8, Code of Alabama 1975, states:
 "In cases in which the property to be seized does not include a controlled substance, a search warrant must be executed in the daytime unless the affidavits *Page 334 
state positively that the property is on the person or in the place to be searched, in which case it may be executed at any time of the day or night. Except in cases in which the property to be seized includes a controlled substance, the issuing judge or magistrate must state in the warrant, according to the character of the affidavits, whether it is to be executed by day or at any time of the day or night. In cases in which the property to be seized includes a controlled substance, a warrant may be executed at any time of the day or night."
(Emphasis added.) Rule 3.10 states:
 "The search warrant shall be directed to and served by a law enforcement officer, as defined by Rule 1.4(p). It shall command such officer to search, within a specified period of time not to exceed ten (10) days, the person or place named for the property specified and to bring an inventory of said property before the court issuing the warrant. The warrant shall designate the judge or magistrate to whom an inventory of the property specified shall be returned. The judge or magistrate shall endorse the warrant, showing the hour, date, and the name of the law enforcement officer to whom the warrant was delivered for execution, and a copy of such warrant and the endorsement thereon shall be admissible in evidence in the courts. In cases in which the property to be seized does not include a controlled substance, a search warrant must be executed in the daytime unless the affidavits state positively that the property is on the person or in the place to be searched, in which case the search warrant may be executed at any time of the day or night. Except in cases in which the property to be seized includes a controlled substance, the issuing judge or magistrate must state in the warrant, according to the character of the affidavits, whether it is to be executed by day or at any time of the day or night. In cases in which the property to be seized includes a controlled substance, a warrant may be executed at any time of the day or night and the warrant need not state whether it is to be executed by day or at any time of the day or night."
(Emphasis added.)
Thus, before a search warrant may be executed at night two prerequisites must be met: 1) the warrant must state positively that the property sought is on the premises to be searched, and 2) the warrant must state that it is to be executed at nighttime. See § 15-5-8, Code of Alabama 1975, and Rule 3.10, Ala.R.Crim.P.
Here, there is no question that the warrant and supporting affidavit positively state that the property was located in Tyson's apartment. (See discussion in Part I.B.) Our discussion here focuses on the failure of the warrant to indicate that it could be executed at night.
The search warrant executed for Tyson's apartment read as follows:
 "Affidavit in support of application for a search warrant having been made before me, and the Court's finding that grounds for issuance exist or that there is probable cause to believe that they exist, pursuant to Rule 3.8, Alabama Rules of Criminal Procedure, you are hereby ordered and authorized to forthwith search:
 "The following person or place: 401 A North Church Street. This search warrant is to include any persons and vehicles on the premises or any area within the legal curtilage of the residence.
 "For the following property: Any and all firearms, bullets, casings, ammunition. *Page 335 
" This warrant may only be executed
 " in the daytime between the hours of __________ __.m., and __________ __.m.
 " The Court finds probable cause to believe that a nighttime search is necessary, and this warrant may be executed at any time of the day or night.
 "Issued to: Raymon D. Smith, ABI (name and agency of officer) at 7:45 o'clock. p.m., this 17 day of January, 1997."
It is undisputed that the judge failed to check on the face of the warrant that the warrant was to be executed at nighttime. The question is whether this failure renders the warrant invalid and the subsequent search unlawful. We hold that it does not.
This Court addressed a similar issue in Gamble v. State, 473 So.2d 1188
(Ala.Cr.App. 1985), where we stated:
 "The question, as the trial court framed it in its order denying the motion to suppress, is `whether or not, under the circumstances of this case, the failure of the issuing judge to use the words "at anytime of day or night" or words of similar import in the warrant invalidates the warrant and renders inadmissible the evidence discovered during the search.' We answer that question in the negative.
 "In Dean v. State, 54 Ala. App. 270, 307 So.2d 77
(Ala.Cr.App. 1975), this court upheld a nighttime search for which the warrant lacked a directive that it be served `at any time of the day or night.' We found that because the warrant was in fact issued at night under authorization for an `immediate' search, the statutory requirement of § 15-5-8 was satisfied. See also United States v. Sturgeon, 501 F.2d 1270 (8th Cir.), cert. denied, 419 U.S. 1071
(1974). The same situation is present here. As the trial judge found, `The issuing judge was requested and did issue the warrant in the middle of the night knowing that if would be immediately executed.'
 "[The defendant] insists that the trial court's finding regarding the issuing judge's knowledge of when the warrant was to be executed is a fact outside the record of which there is no proof. We do not believe, however, that the finding is one which requires proof of the district judge's state of mind. Because the record clearly shows that Judge Kennedy issued the warrant in the nighttime hours and the warrant form directed an `immediate' search, the actual state of the judge's mind is immaterial; the record speaks for itself. In a similar case, the Court of Appeals for the Sixth Circuit agreed, reasoning that, `[T]he Kentucky judge here undoubtedly knew such a search would occur, since he was requested to and did issue the warrant [authorizing an "immediate" search] in the middle of the night.' United States v. Searp, 586 F.2d 1117, 1122 (6th Cir. 1978), cert. denied, 440 U.S. 921 (1979). See also State v. Dudgeon, 13 Ariz. App. 464, 477 P.2d 750 (1970) (judge who issued warrant but failed to strike out words `in the daytime' from the form phrase `in the daytime (or at any time of the day or night)' knew that the warrant would be executed at night because it was issued after dark).
 "Although there is a split of authority on the admissibility of evidence obtained in a nighttime search when the warrant does not contain language authorizing nighttime execution, see generally
Annot. 58 A.L.R. Fed. 757 (1982); compare State v. Dudgeon, supra (allowing evidence), with State v. Dalrymple, 80 N.M. 492, *Page 336 458 P.2d 96 (1969) (disallowing evidence on the ground that a warrant must conform to statutory requirements in every material detail), of those courts finding the warrant technically invalid many have, nevertheless, refused to order suppression of the evidence on one or more of the following grounds, namely: (1) a statutory — as opposed to a constitutional — violation does not automatically warrant exclusion, see, e.g., United States v. Searp, supra; State v. Lien, 265 N.W.2d 833 (Minn. 1978); (2) the statutory violation was not a result of bad faith conduct on the part of law enforcement authorities, see e.g., United States v. Searp, and (3) the violation did not affect the defendant's substantial rights, see e.g., United States v. Ravich, 421 F.2d 1196 (2d Cir.), cert. denied, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66
(1970).
 "In the case before us, the good faith of the Montgomery police officer who requested the search warrant is evident. Officer Mims' affidavit requested a nighttime search warrant and contained facts adequate for the issuance of a nighttime warrant. [The defendant] was not subjected to an abusive, arbitrary intrusion into his home in the middle of the night, but was already in custody and his vehicle under surveillance. As the Supreme Court has recognized, a night search of a residence is particularly offensive. `[I]t is difficult to imagine a more severe invasion of privacy than [a] nighttime intrusion into a private home.' Jones v. United States, 357 U.S. 493, 498, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958).
 "Although the form of the search warrant here was not in absolute compliance with statutory mandates, the defendant's substantial rights were not infringed and the search met the requirements of the Fourth Amendment."
473 So.2d at 1194-95.
Other states have reached the conclusion we reached in Gamble. InPeople v. Arnow, 108 Misc.2d 128, 436 N.Y.S.2d 950 (1981), a New York court found that the failure of a search warrant to indicate that it could be executed at nighttime was only a "technical" defect because the warrant was applied for at 11:10 p.m. In Nunes v. Superior Court ofStanislaus County, 100 Cal.App.3d 915, 161 Cal.Rptr. 351 (1980), a California court found that a judge's failure to indicate that the search warrant was to be executed at night was due to the judge's omission and that the officers executing the warrant relied on the warrant in good faith.
Here, Officer Raymon Smith of the Alabama Bureau of Investigation testified that when he applied for the warrant he told the judge that he and his fellow officers had already been to Tyson's apartment to execute an warrant for Tyson's arrest for the Union Springs shooting. He said that when they attempted to secure the apartment, an individual later identified as Maurice Gay, approached the officers pointing a shotgun. The officers pursued Gay into a back bedroom where they discovered a silver and black Lorcin .380, similar to the gun described as having been used in the Union Springs shooting. Smith said that he left officers at the residence and proceeded to secure a search warrant.
The face of the warrant reflects the following: "Issued to: Raymon S. Smith, ABI . . . at 7:45 o'clock p.m., this 17 day of January, 1997." The return shows that the warrant was executed at 8:00 p.m. Agent Smith stated that he told the judge that officers were at the scene and that he was going to execute the warrant when it was approved by the judge. The failure of the judge to indicate on the face of the *Page 337 
warrant that it was to be executed at nighttime was a technical error that did not invalidate the search. The officers acted in good faith. As we recognized in Rivers v. State, 695 So.2d 260, 262 (Ala.Cr.App. 1997):
 "The good faith exception provides that when officers acting in good faith, that is, in objectively reasonable reliance on a warrant issued by a neutral, detached magistrate, conduct a search and the warrant is found to be invalid, the evidence need not be excluded. United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). "
We observe that "nighttime," for purposes of the execution of a search warrant, is not defined in the Alabama Criminal Code. Although, the Federal Rules of Criminal Procedure do not define "nighttime," they do define, for warrant purposes, "daytime" as "the hours from 6:00 a.m. to 10:00 p.m." From this we can infer that nighttime, for warrant purposes, would be the time between 10 p.m. and 6 a.m. See Rule 41(h), Fed.R.Crim.P.
In this case the warrant was not executed in the middle of the night after arousing Tyson from his sleep. Here, the evidence showed that Tyson was not home at the time the search warrant was executed. The circumstances of the search in this case do not reflect that the search violated the rights that the Fourth Amendment seeks to protect. The omission of the provision in the warrant that it could be executed at night was a technical error and did not result in a constitutional violation.
 B.
Tyson next argues that the trial court erred in not suppressing the evidence because, he says, the apartment number shown on the warrant as the apartment to be searched was not the correct number. Tyson contends that his "correct apartment which was searched was actually 401-C rather than 401-A." (Appellant's brief at 52).
Even if we were to concede, which we do not, that the warrant listed the wrong apartment number[2] there would still be no reason to invalidate the search. As this Court has stated concerning the description in a warrant of the place to be searched:
 "`A warrant's description of the place to be searched is not required to meet technical requirements or have the specificity sought by conveyancers. The warrant need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority. An erroneous description of premises to be searched does not necessarily render a warrant invalid. The Fourth Amendment requires only that the search warrant describe the premises in such a way that the searching officer *Page 338 
may "`with reasonable effort ascertain and identify the place intended.'" United States v. Weinstein, 762 F.2d 1522, 1532 (11th Cir. 1985) (citations omitted).' United States v. Burke, 784 F.2d 1090, 1092 (11th Cir. 1986), cert. denied, 476 U.S. 1174, 106 S.Ct. 2901, 90 L.Ed.2d 987 (1986).
 "The test for determining the sufficiency of the description of the place to be searched is set out in Lyons v. Robinson, 783 F.2d 737, 738 (8th Cir. 1985):
 "`The test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched. United States v. Gitcho, 601 F.2d 369, 371 (8th Cir.) (citations omitted), cert. denied, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979). Thus, where a search warrant contain[s] information that particularly identified the place to be searched, [many courts have] found the description to be sufficient even though it listed the wrong address. United States v. McCain, 677 F.2d 657, 660-61 (8th Cir. 1982).'
 "In the instant case, the warrant listed the residence to be searched as located on `Center Street,' whereas the residence was actually located on Center Drive. However, it is clear that the error in the warrant was not misleading or confusing.
 "`In evaluating the effect of a wrong address on the sufficiency of a warrant, this Court has also taken into account the knowledge of the officer executing the warrant, even where such knowledge was not reflected in the warrant or in the affidavit supporting the warrant. In United States v. Weinstein, [762 F.2d 1522], where a search warrant failed to specify correctly the entrance leading to the premises to be searched, we considered it significant that the agent conducting the search had been to the premises before and that he had no doubt which door gave access to the correct premises. Id. at 1532-33.' Burke, 784 F.2d at 1092-1093.
 "In United States v. Turner, 770 F.2d 1508, 1511
(9th Cir. 1985), cert. denied, 475 U.S. 1026, 106 S.Ct. 1224, 89 L.Ed.2d 334 (1986), the court observed: `In the case at bar, the warrant description was sufficiently particular. The verbal description contained in the warrant described the house to be searched with great particularity; the address in the warrant was reasonable for the location intended; the house had been under surveillance before the warrant was sought; the warrant was executed by an officer who had participated in applying for the warrant and who personally knew which premises were intended to be searched; [instructions on how to reach the property by car delineated both adjacent roads and mileage]; and the premises that were intended to be searched were those actually searched. Under these circumstances, there was virtually no chance that the executing officer would have any trouble locating and identifying the premises to be searched, or that he would mistakenly search another house.' See also Burke, 784 F.2d at 1093."
Helton v. State, 549 So.2d 589, 590-91 (Ala.Cr.App. 1989), cert. denied,493 U.S. 1077 (1990). See also Grantham v. State, 580 So.2d 53
(Ala.Cr.App. 1991), after remand, 602 So.2d 1226 (Ala.Cr.App. 1992), aff'd, 613 So.2d 1260 (Ala. 1993), where this *Page 339 
Court relied on United States v. Turner, 770 F.2d 1508 (9th Cir. 1985), cert. denied, 475 U.S. 1026 (1986), and United States v. Burke,784 F.2d 1090 (11th Cir. 1986), cert. denied, 476 U.S. 1174 (1986), cited by the Helton Court.
Here, the affidavit in support of the search warrant stated that officers had previously been to Tyson's apartment to execute an arrest warrant. Officer Smith left officers at the apartment while he went to secure a search warrant. Officer Smith then proceeded to execute the warrant. Smith had been to Tyson's apartment minutes before the warrant was issued. Tyson concedes this in his brief, where he states: "[G]overnment agents had been to the apartment complex and Tyson's apartment." (Appellant's brief at 53). "`[T]here was virtually no chance that the executing officer would have any trouble locating and identifying the premises to be searched. . . .'" Helton, 549 So.2d at 591, quoting United States v. Burke, 784 F.2d 1090, 1093 (11th Cir. 1986), cert. denied, 476 U.S. 1174 (1986). Even if the warrant listed the wrong apartment number, it was not invalid on that basis.
 C.
Tyson next argues that the affidavit in support of the search warrant was invalid because, he says, it was not based on probable cause. The affidavit read as follows:
 "On the evening of January 14, 1997, a shooting occurred in Union Springs, Alabama, that involved the firing of multiple shots from a vehicle occupied by several black males at one Nicholas Martin (hereinafter Martin). Martin is a 26 year old back male from Union Springs. Martin identified the vehicle as a blue Pontiac displaying a "55" tag occupied by four black males. Words were apparently exchanged and then shots were fired from the vehicle at Martin, who then ran. Martin identified one of the occupants of the vehicle as a person known to him as Anthony Tyson (hereinafter Tyson). Martin stated that he has seen Tyson on several occasions prior to this incident and can identify Tyson. Martin also identified Tyson as one of the persons shooting from the vehicle.
 "The police were notified by phone and a description of the vehicle, which left the area, was provided and dispatched. Union Springs officers tried to stop a vehicle fitting the description given. The said vehicle fled the stop attempt; and a chase commenced. State Troopers became involved in the chase. The vehicle fled Bullock County into Macon County where Tuskegee Police Officers and Macon County Sheriff's deputies joined the pursuit.
 "The vehicle was pursued onto Macon County Road 3, or Howard Road, and entered the area of the project apartments. The vehicle finally stopped on Foster Street in Tuskegee, where several subjects fled the car and escaped. One subject, Willie Jernel Stinson, an 18 year old black male, was captured before he could flee the vehicle.
 "After having his Miranda rights read to him, Stinson identified the other three occupants of the vehicle, including Tyson. Stinson stated that he was in the car with the other three subjects in Union Springs. Stinson stated that Tyson shot several times at an individual in Union Springs. Stinson stated that Tyson used a .380 semi-automatic pistol during the altercation. Stinson further stated that he has seen Tyson with this .380 semi-automatic pistol on several occasions. *Page 340 
 "The Tuskegee Police Department impounded the vehicle that was apprehended during the high speed chase. Consent to search the vehicle was obtained from the owner. The search of the vehicle revealed one .380 caliber shell casing.
 "Investigators returned to the shooting scene on Ellis Street in Union Springs. Several empty cartridge casings were found on the ground in the area, all .380 caliber. One spent bullet was also found.
 "The vehicle that the subjects fled in stopped approximately 2.5 miles from Tyson's residence before subjects jumped out and ran. Tyson was seen at his residence less than 36 hours after the shooting incident in Union Springs.
 "On January 17, 1997, officers attempted to serve arrest warrants from Bullock County on Tyson at his residence at 401-A North Church Street, Tuskegee, Alabama. While attempting to serve the arrest warrants on Tyson, officers encountered three subjects inside the residence. The subjects informed officers that they had just missed Tyson by approximately five minutes. One of the subjects in the residence, Maurice Gay, was also identified by Stinson as being involved in the shooting in Union Springs. Maurice Gay came out of the rear bedroom pointing a gun at officers.
 "For the foregoing reasons, the undersigned officer has probable cause to believe that the weapon(s) used during the shooting in Union Springs and other related evidence may be contained in Tyson's residence."
In evaluating whether probable cause exists this court has stated:
 "`Probable cause deals with probabilities, not legal technicalities. It is grounded upon those practical, factual considerations of everyday life upon which reasonable and prudent men act. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948). Thus, probability and not proof necessary to convict for criminal activities is the standard for determining probable cause. Yielding v. State, 371 So.2d 951 (Ala.Cr.App.), cert. denied, 371 So.2d 962 (Ala. 1979).'
 "Carter v. State, 405 So.2d 957, 959 (Ala.Cr.App.), cert. denied, 405 So.2d 962 (Ala. 1981).
 "`Probable cause does not require an officer to compile an airtight case against a suspect.' Williams v. State, 440 So.2d 1139, 1145
(Ala.Cr.App. 1983). However, the officer must have more than a mere suspicion that the suspect committed a crime. Moore v. State, 415 So.2d 1210, 1216 (Ala.Cr.App.), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982). The issue of probable cause `must be determined from the facts of each case.' Waldrop v. State, 462 So.2d 1021, 1029
(Ala.Cr.App. 1984), cert. denied, 472 U.S. 1019. 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985)."
Jones v. State, 616 So.2d 949, 950 (Ala.Cr.App. 1993).
The affidavit was very thorough; it meticulously outlined Tyson's connection to the Union Springs shooting. Clearly, the affidavit established probable cause for the officers to believe that the weapon used in the Union Springs shooting was in Tyson's apartment.
 II.
Tyson next argues that the trial court erred in prohibiting him from cross-examining Angelo Della Manna, an expert witness on DNA who testified for the State. Manna testified that the blood found on *Page 341 
the sneakers taken from Tyson's apartment matched Thompson's blood. He testified that a profile on the blood revealed that the blood would occur in Alabama's population approximately 1 out of 11,900,000,000 times for white individuals and approximately 1 out of 35,700,000,000 for black individuals. The record reveals that after cross-examining Manna for what ultimately was approximately 25 pages of record the following occurred:
 Q — [Defense counsel]: Now, you mentioned 10 percent. If we could just take this example. Let's say that y'all were doing a survey in Europe, and let's say that you found that in doing your survey in Europe, you found — I've got blond written up here. Let's say 1 in 10 people in Europe had blond hair, and let's say that in the survey of all of Europe you found that 1 in 10 people had blue eyes. And in continuing on in your survey, you found that 1 in 10 people in your survey of all of Europe had fair skin, okay? Now, in the multiplication rule, correct me if I'm wrong, would you not be multiplying these 10's on the bottom so that it would be 10 times 10 times 10 to get 1 in a 1,000 people in Europe would have blond hair, blue eyes, and fair skin?
 A — [Manna]: That's true. That's the way it's done.
"Q: That would apply over all of Europe, correct?
"A: Whatever —
"Q: Or whatever —
"A: Whatever your number of 10 came from, yes.
 "Q: Now, if you were to take this multiplication or the product rule that you have come up with, this 1 in a 1,000 and you were to apply it and say in the Nordic region of Norway or Sweden, you would still be saying to expect to find 1 out of a 1,000 people in that area of Europe would have blond hair, blue eyes, and fair skin, correct?
 "Mr. Lisenby [prosecutor]: I object to that, that being —
 "The Court: Sustained. I'm going to send the jury out for just a minute."
After this objection a thorough discussion occurred outside the presence of the jury.
 "The Court: I want to just observe the irregularity of the cross-examination and my reason for sustaining the objection. The witness was asked to assume three different traits that are quite typical of Nordic populations. The witness was then asked, in my judgment deliberately, the extremely misleading question that would lead to the conclusion that 1 out of a 1,000 person in that population would have that characteristic. Now, that leads us into a realm of theoretical argument that is inappropriate to the trial of the case. That would make the cross-examination irrelevant and not to mention improper because it asks an expert witness to make assumptions that are not based on facts that are available in this case, and it would have presented to the jury the appearance that the witness who was asking — answering the question correctly based on a statistical analysis but had been led into that by asking — by being asked false assumptions. So, counsel, I will ask you under no circumstances — you may lead the witness, but proper function of cross-examination is never to mislead the witness. Only if it were going to test his credibility and his general knowledge of the world so that he would have to express the nonexpert opinion that a majority of people in the Nordic population are not — do not fit into that racial characteristic. Don't do that anymore.
 "Mr. Goggans [defense counsel]: Your Honor, if I could briefly — I was getting *Page 342 
my analysis out of a publication by the National Research Council. The witness has put forward what I think is strong evidence —
 "The Court: What the witness has said is entirely statistically correct based on statistics and based on fairly advanced courses in statistics that I have had the opportunity to participate in myself, and I'm sure that it will be consistent with what you say there. What you did that I am counseling you not to do again is to ask him to assume facts that are not in evidence and that are, in fact, not true in order to produce what appears to be a very misleading impression to the jury. Don't do that. You may do it — you know, you can lead him, you can try to trip him up. But to try to trip up the jury is another matter, and that's what the tendency of that particular line of questioning was to do. It was to make him look as if he had just expressed the opinion that 1 out of a 1,000 of the Nordic people in, say, Finland are blond hair, blue eyes, fair complexion.
". . . .
 "Mr. Goggans: Actually I think that what I was trying to do is show that the 1 out of a 1,000 would not be correct in the Nordics. National Research Council in this book, DNA Technology Forensic Science was putting forward one of the problems with the multiplication rule, and what they were doing is this exact example of the 1 in 10, 1 in 10, and 1 in 10.
". . . .
 "The witness [Manna]: I just wanted to clarify that the report he was reading out of the National Research Council, the 1996 report, of course, specifically endorsed what we are calling here the product rule. The interesting thing that he is trying to talk about with the Nordic populations and that frequency wouldn't, in fact, you know, be applicable to blond hair, blue eyes, fair skin in Sweden being 1 in a 1,000 has —
 "The Court: It's because the population base with which you're dealing is different.
 "The witness: That's correct. And, in fact, I answered his question earlier saying that our database has been statistically proven to not exhibit subgroups anyway. So that's not an issue in the State of Alabama."
(Emphasis added.)
Every accused has the right to a thorough and sifting cross-examination. The importance of this right is recognized in Alabama not only in the Alabama Constitution, Art. I, § 6, Ala. Const. 1901, but in statutory law, § 12-21-137, Code of Alabama 1975, and the Alabama Rules of Evidence, Rule 611(b). Art. I, § 6, Ala. Const. 1901, states in part:
 "The cross-examining party has the absolute right on cross-examination, not only to inquire as to matters relevant to the issues . . . but also to inquire into the conduct and circumstances of the witness which have measurable bearing upon his credibility. This right to a party to have thorough and sifting cross-examination is provided by statute."
While we recognize the importance of the right to cross-examination, we have held that this right is not unlimited and that it "does not entitle a party to repeat questions that have already been answered. Lloyd v.State, 53 Ala. App. 730, 304 So.2d 232 [, cert. denied, 293 Ala. 410,304 So.2d 235 (Ala.), after remand, 339 So.2d 1058 (Ala.Cr.App.), cert. denied, 339 So.2d 1062 (Ala. 1976)]." Proctor v. State, 331 So.2d 828,831 (Ala.Cr.App. 1976).
 "`A party is entitled to a thorough and sifting cross-examination of the witness *Page 343 
against him, § 12-21-137, Code of Alabama 1975; however, the trial court is vested with considerable control over the scope of the cross-examination, and its rulings thereon will not be reversed in the absence of a gross abuse of discretion that causes substantial injury to the objecting party. Perry v. Brakefield, 534 So.2d 602 (Ala. 1988).'"
Jackson v. State, 674 So.2d 1318, 1348 (Ala.Cr.App. 1993), aff'd in part, rev'd in part, 674 So.2d 1365 (Ala. 1994), on remand, 674 So.2d 1370
(Ala.Cr.App.), after remand, 674 So.2d 1370 (Ala.Cr.App. 1995), quotingMcMillian v. State, 594 So.2d 1253, 1261 (Ala.Cr.App. 1991), remanded,594 So.2d 1288 (Ala.), on remand, 594 So.2d 1289 (Ala.Cr.App. 1992), after remand, 616 So.2d 933 (Ala.Cr.App. 1993).
Here, a review of the transcript reveals that the information defense counsel sought to elicit — that the database in Alabama for DNA matching could possibly contain subgroups that would affect the application and effect of the multiplication rule in Alabama — had already been answered in the negative by the expert. (See emphasized portion of the record quoted above.) The expert testified in a bench discussion and he testified before the jury that the information that defense counsel sought was not a factor in population frequency statistics in Alabama because Alabama's database had been proven not to have subgroups. Defense counsel's question, which he now contends was error for the trial court to limit, had already been answered when the above-referenced exchange took place. While we do not condone curtailing cross-examination, we are confident, after reviewing the record, that Tyson's right to cross-examination was not limited in any respect.
 III.
Tyson also argues that the trial court erred in allowing evidence of an offense not charged in the indictment to be received at trial. Tyson argues that the trial court should not have allowed evidence that he had been involved in a shooting in Union Springs. He asserts that this evidence should not have been admitted because its only purpose was to show that he had committed other bad acts.
The State contends that evidence of the Union Springs shooting was admissible because it went towards establishing the identity of Cowan's and Thompson's murderer. See Weeks v. State, 456 So.2d 395 (Ala.Cr.App. 1983), aff'd, 456 So.2d 404 (1984), cert. denied, 471 U.S. 1030 (1985). It further argues, citing federal caselaw, that evidence of the Union Spring shooting was admissible because it was relevant to prove Tyson's connection to the gun used in the double murder. See United States v.Shea, 159 F.3d 37 (1st Cir. 1998), cert. denied, 526 U.S. 1077,119 S.Ct. 1480 (1999); United States v. Mitchell, 613 F.2d 779 (10th Cir. 1980), cert. denied, 445 U.S. 919 (1980); and United States v. Roberts,933 F.2d 517 (7th Cir. 1991).
Rule 404(a), Ala.R.Evid., states: "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." However, there are many recognized exceptions to this general exclusionary rule. Rule 404(b) states:
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the *Page 344 
accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial. . . ."
The State argues, citing Weeks, that the evidence of the Union Springs shooting fits within the identity exception to the exclusionary rule. This Court stated in Weeks:
 "The evidence about which the appellant complains was absolutely essential to establish the appellant's possession of the murder weapon. . . .
 "This court has stated that evidence of other crimes is admissible in court `when it is necessary to prove the identity of the offender, or of an instrument used in committing the offense.' Allen v. State, [380 So.2d 313 (Ala.Cr.App. 1979), cert. denied, 380 So.2d 341 (Ala.), cert. denied, 449 U.S. 842 (1980)]."
456 So.2d at 400.
However, before a collateral offense can be introduced under the identity exception, two requirements must be met: 1) identity must be an issue, and 2) the collateral crime must have been committed in the "same novel and peculiar manner." As we stated in Copeland v. State,455 So.2d 951, 954-55 (Ala.Cr.App.), cert. denied, 455 So.2d 956 (Ala. 1984):[3]
 "It is established in Alabama that admission of evidence of other collateral crimes may not be used as substantive evidence of guilt of the defendant. C. Gamble, McElroy's Alabama Evidence, § 69.01 (3rd ed. 1977); Lewis v. State, 399 So.2d 907
(Ala.Crim.App. 1981); Breen v. State, 349 So.2d 113
(Ala.Crim.App. 1977). However, there are several exceptions to this general rule. One such exception to this rule, which is applicable in this case, is the identity exception. In order for a collateral crime to be admissible under the identity exception, the crime must have been committed `in the same novel and peculiar manner' as the crime for which the accused is now charged. C. Gamble, McElroy's Alabama Evidence, § 69.01(8) (3rd ed. 1977); Smith v. State, 409 So.2d 455 (Ala.Crim.App. 1981); Breen v. State, supra. Also, the `identity exception to the general exclusionary rule only becomes applicable when the identity of the person who committed the now-charged crime is in issue.' C. Gamble, McElroy's Alabama Evidence, § 69.01(8) (3rd ed. 1977); Thomas v. State, 409 So.2d 955 (Ala.Crim.App. 1981). There have been a plethora of cases in Alabama dealing with the identity exception, many of which have held that crimes were so similar that they can be used to be the work of a single individual, thus serving the purpose of identifying the accused. See, e.g., Smith v. State, supra; Thomas v. State, supra; Hayes v. State, 384 So.2d 623 (Ala.Crim.App. 1979), cert. quashed, 384 So.2d 627 (Ala. 1980); Breen v. State, supra."
Here, there is no question that identity was at issue. Tyson denied killing Cowan and Thompson; his whole defense centered around placing the blame on another person who was seen in a car with the two victims on the day of the double murder. The State does not address the similarities of the Union Springs shooting and the double murders. We note that the Union Springs shooting and the double murders were related in that both involved shootings from vehicles and the same gun was used in both instances. A literal reading of this Court's decision in Weeks, *Page 345 
although it does not address the requirements for admission of evidence under the identity exception, supports the conclusion that the use of the same weapon in a collateral offense is sufficient to invoke the identity exception to the exclusionary rule. There is strong support for this conclusion.
However, evidence of the Union Springs shooting was admissible for another reason. We cite with approval the federal[4] cases cited by the State in brief and adopt the rationale of the district court in UnitedStates v. Shea, 159 F.3d 37 (1st Cir. 1998), which stated:
 "Shea argues on appeal that the district court erroneously admitted the black revolver seized from him during his arrest on a separate charge, one week after the attempted Londonderry robbery. Prior to trial, Shea filed a motion to exclude evidence of the revolver. The district court denied the motion and ruled the revolver admissible under Fed.R.Evid. 404(b) `on the issue of identity.'
 ". . . Here, the government sought to prove that the gun seized from the defendant was the same gun used in the attempted Londonderry robbery. In other words, the government sought to introduce the gun as intrinsic, direct evidence of the charged crime — not as Rule 404(b) evidence. Because we conclude that the handgun was not Rule 404(b) evidence at all, we review the district court's admission of the gun applying a more appropriate Rule 401/403 analysis.
 "Rule 401 defines `relevant evidence' as `evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Fed.R.Evid. 401. The principal issue at trial, as happens so often in bank robbery cases, was the identification of Shea as one of the back robbers. Indeed, the government introduced the black revolver at trial to prove that Shea was one of the Londonderry robbers.
 "In United States v. Roberts, on facts similar to those presented here, the Seventh Circuit affirmed the district court's admission of a firearm seized from the defendant during his arrest two days after the charged offense. See 933 F.2d 517, 520 (7th Cir. 1991). The defendant was charged with committing an armed robbery on July 20, 1989. See id. at 517-518. Two days after the robbery, the defendant was arrested while fleeing another robbery attempt. See id. at 518. During his flight from the police, Roberts either dropped or threw a blue steel revolver off a rooftop. See id. The Seventh Circuit concluded that `[e]vidence that Roberts was caught with a dark steel revolver with a brown handle matching the description of the weapon he used only two days earlier to rob the . . . bank is directly relevant to the crimes with which he was charged.' Id. at 520.
 "The Seventh Circuit's reasoning in Roberts applies to the facts of the present case. As in Roberts, the proof that upon arrest Shea had in his possession a black .38 caliber revolver was `directly relevant' to the crime with which he was charged. See Roberts, 933 F.2d at 520. As evidence linking Shea to the crime, possession of the handgun tended to make his participation in the robbery `more probable . . . than it would be without the evidence.' Fed.R.Evid. 401."
159 F.3d at 39-40.
The record shows that the evidence of the Union Springs shooting was admitted, *Page 346 
not for the purpose of showing Tyson's bad character and showing that he acted in conformity with that character by shooting Cowan and Thompson, but for the purpose of establishing Tyson's connection to the murder weapon. As this Court stated in Allen v. State, 380 So.2d 313, 329-30
(Ala.Cr.App. 1979), cert. denied, 380 So.2d 341 (Ala.), cert. denied,449 U.S. 449 (1980):
 "In McElroy's Alabama Evidence, 3rd Ed., § 69.01(1), p. 135, we read:
 "`However, it must not be considered that such a listing of admissible purposes was intended to be exhaustive. It must ever be borne in mind that the State may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character.' [Emphasis added].
"Also, we find in McElroy, supra;
 "`The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such is offered to show the defendant's bad character. If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such other act is admissible.' [Emphasis added].
". . . .
 "In the present case, the contention of the appellant that the evidence and testimony of other acts were inadmissible because they tended to prove that she was guilty of other crimes is not sustained. It is well settled by the foregoing decision that, while evidence of a commission of one crime is not inadmissible to establish a party's guilt to the charged crime, such evidence is admissible if relevant to prove another crime."
This Court's decision in Allen is in line with the holding of the federal cases cited above.
Thus, our determination of the admissibility of the evidence rests on whether this evidence was relevant to Tyson's guilt in the double murder. See Rule 401(b), Ala.R.Evid. Alabama has always taken a liberal view of relevancy and allowed evidence, "if it has any tendency to lead in logic to make the existence of the fact for which it is offered more or less probable than it would be without the evidence." Rule 401(b), Ala.R.Evid. Tyson's possession of a gun used in a shooting in Union Springs that was identified, though forensic evidence, as the murder weapon "tended to make his participation in the double murder `more probable . . . than it would be without the evidence." Shea, 159 F.3d at 40.
Moreover, Tyson's attorney at a pretrial hearing stated:
 "Your Honor, with respect to the difference between the Union Springs cases and this case in Macon County involving the capital murder charges, I understand that part of the State's evidence in its case-in-chief will relate to what happened in Union Springs in an effort to tie in shell casings and matching up ballistics evidence from what happened in Unions Springs with projectiles that were removed from the deceased in this Macon County case. They are related. The Macon and Union Springs are related."
We agree with the State that this statement by Tyson's attorney led the State to believe that the Union Springs shooting and the double murder were related.
The trial court correctly admitted evidence of the Union Springs shooting. *Page 347 
 IV.
Tyson also argues that the trial court erred in allowing into evidence, in the penalty phase, a sentencing order that showed that Tyson had previously been sentenced to life imprisonment for attempted murder and for shooting into an occupied dwelling. He argues that the prosecution failed to meet its burden of proving the aggravating circumstance in § 13A-5-49(2), that the defendant had previously been convicted of an offense involving the use or threat of violence to the person, because the sentencing order did not indicate that Tyson had been found guilty of either offense. For the following reasons we find no error.
Initially, we note that Tyson neither argued at trial nor on direct appeal that he had not been convicted of attempted murder and of shooting into an occupied dwelling. In fact, the record shows that Tyson pleaded guilty to these offenses.
The sentencing order in those prior cases reads as follows:
 "This day being the day set for sentence hearing and the defendant and his attorney being in open court and being asked by the Court if he has anything to say why the sentence of the law should not be pronounced up him says nothing. It is, therefore, the sentence of law and the judgment of this Court that the defendant be and he is hereby sentenced to life in the penitentiary as punishment on Count I of the indictment for attempted murder, and life in the penitentiary as punishment on Count III of the indictment for shooting into an occupied dwelling, in the manner and forms provided by law. Further the defendant is ordered to pay court costs, $50.00 [to the] Victims Compensation Fund, and attorney fees."
Tyson's argument appears to rely on this Court's decision in Hurth v.State, 688 So.2d 275 (Ala.Cr.App. 1995), which limited the application of the Habitual Felony Offender Act to those cases in which the prior convictions formally showed an "adjudication of guilt." However, Hurth
was recently overruled by this Court in Morgan v. State, 733 So.2d 940,944 (Ala.Cr.App. 1999), which stated:
 "Because the record in the present case clearly shows that the appellant was adjudicated guilty, although that exact term was not used, and in the interest of judicial consistency and efficiency in light of the fact that other states often do not use this exact phrase and prior convictions for purposes of the HFOA may originate in those states, we conclude that the appellant received sufficient notice and the State properly proved these prior convictions. To the extent that Hurth v. State, 688 So.2d 275
(Ala.Cr.App. 1995), conflicts with this case, it is due to be overruled."
This Court in Perkins v. State, [Ms. CR-93-1931, November 19, 1999] ___ So.2d ___ (Ala.Cr.App. 1999), when determining whether the State had proven a prior conviction for application of this aggravating circumstance, stated:
 "Although a prior conviction may be proved by a properly certified case action summary sheet, there is no requirement that the prior conviction can be proved only by this type of documentary evidence. See Smith v. State, 727 So.2d 147 (Ala.Cr.App. 1998), aff'd, 727 So.2d 173 (Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, ___ L.Ed.2d ___ (1999); and DeBruce v. State, 651 So.2d 599 (Ala.Cr.App. 1993), aff'd, 651 So.2d 624 (Ala. 1994)."
The Perkins court held that a prior conviction could be proven by a victim's testimony that the defendant had been convicted of the prior offense.[5] *Page 348 
Here, the State proved the prior conviction by submitting the sentencing order resulting from the prior convictions. This State has traditionally held that a valid sentence implies a judgment of guilt. SeeDriggers v. State, 123 Ala. 46, 26 So. 512 (1899); Higginbotham v.State, 20 Ala. App. 159, 101 So. 166 (1924); Walker v. State,12 Ala. App. 229, 67 So. 719 (1915); Thames v. State, 12 Ala. App. 307,68 So. 474 (1915); Stanfield v. State, 3 Ala. App. 54, 57 So. 402
(1912).[6]
Moreover, if any error did occur in the proof of the convictions for attempted murder and for shooting into an occupied dwelling, we believe that it was harmless, because the result would be unchanged without that evidence. Rule 45, Ala.R.Crim.P. In addition to the prior convictions challenged, Tyson had also pleaded guilty to manslaughter and was sentenced to 10 years in the state penitentiary as a result of that conviction. This prior conviction alone was sufficient to invoke the aggravating circumstance, in § 13A-5-49(2), that "[t]he defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person."
 V.
Tyson argues that the trial court erred in excusing for cause a potential juror because she indicated that although she still owned a house in Macon County she apparently resided in Lee County, where she was registered to vote, obtained her driver's license, and was building a house. During the voir dire of the potential jurors the following occurred:
 "Juror: I have a residence in Notasulga. We're building a house in Beulah. So we still live in Notasulga, but we stay in Beulah a great deal while they're working on our house.
"Mr. Gibbs [prosecutor]: And Beulah is where?
"Juror: It's Opelika.
"Mr. Gibbs: Lee County?
 "Juror: It is Lee County. We're building there. But legally my residence is still Notasulga. We do have a mailing address for both places.
"The Court: Where do you vote?
 "Juror: I just changed it to Lee County for the last general county election.
 "The Court: All right. And where is your church membership?
"Juror: Lakeview in Auburn.
"The Court: Your driver's license?
 "Juror: I just changed it to — I think I put Lee County on it.
 "The Court: Well, do you get it in Lee County, or do you get it in Macon?
 "Juror: Since we had a mailing address down there — it's difficult to get our mail in Notasulga, so I get it in Lee County.
". . . .
 "The Court: I believe it will be necessary for me to excuse you."
No objection was made to the court's excusing this juror. Thus, our review of this issue is limited to determining whether plain error exists. Rule 45A, Ala.R.App.P.
The qualifications for jury service in Alabama are found in §12-16-60, which states, in part: *Page 349 
 "(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:
 "(1) Is a citizen of the United States, has been a resident of the county for more than 12 months and is over the over the age of 19 years. . . ."
When compiling a master list of prospective jurors from each county, the jury commission is authorized to obtain the names of potential jurors from lists of "all registered voters, persons holding drivers' licenses and registering motor vehicles, and may include other lists, such as lists of utility customers and persons listing property for ad valorem taxation. . . ." See § 12-16-57, Code of Alabama 1975.
Certainly, the facts that this juror was building a house in Lee County, had changed where she was registered to vote to Lee County, had changed her driver's license to Lee County, and was getting her mail in Lee County, indicated that this juror was not qualified to serve as a juror in Macon County. See § 12-16-60. The Alabama Supreme Court has stated that for purposes of § 12-16-60 less proof is required to prove residence than is required for purposes of proving domicile. SeeCity of Orange Beach v. Perdido Pass Developers, Inc., 631 So.2d 850
(Ala. 1993) (court held that county where driver's license was issued and county where mail was received proved county of residence for purposes of § 12-16-60).
The trial court did not err in removing this ineligible juror. As § 12-16-6 states, "It is the duty of the court, before administering the oath prescribed by law to any grand, petit or tales jurors, to ascertain that such jurors possess the qualifications required by law, and the duty required of the court by this section shall be considered imperative." No plain error occurred here.
 VI.
Tyson further argues that the trial court erred in allowing what he contends was a "mugshot" to be received into evidence at trial. The record reflects that during the questioning of Alphonso Cardwell, who was on Franklin Road around the time of the shootings, Cardwell testified that he saw Tyson in the car with Cowan and Thompson immediately before Cowan and Thompson were killed. Cardwell's identification was questioned and evidence was introduced that Cardwell had previously identified Tyson as the person in the car with the victims. Photographs depicting frontal shots of men standing in front of a lined wall were introduced. The following occurred:
 "Mr. Goggans: Your Honor, Mr. Gibbs is trying to rehabilitate the witness by showing him the photographic lineup. I think he can do that. However, the photographic lineup with the picture of Mr. Tyson, obviously that's taken at a police station, which telegraphs to the jury that there's a prior criminal history. What I suggested to Mr. Gibbs is go ahead and ask the witness the question. However, before having that published to a jury, do something to . . . cover up . . . that that's the police station photo.
 "The Court: I don't think that would even show that it was a prior history.
 "Mr. Gibbs: Again, he's not the only one. I mean, there's about half of them in the background.
 "The Court: I overrule the objection. And, for the Record, I disagree with counsel's conclusions that he asserted."
Tyson does not question the fact that a prior identification of the witness is admissible if his identification is compromised at *Page 350 
trial. See C. Gamble, McElroy's Alabama Evidence § 273.01(2) (5th ed. 1996).[7] Tyson challenges only the background of the photographs. He contends that because the photographs had lines on them indicating height of the participant the jury could have inferred that Tyson had a criminal history.
This Court in DeBruce v. State, 651 So.2d 599 (Ala.Cr.App. 1993), aff'd, 651 So.2d 624 (Ala. 1994) stated:
 "`The presence of lines in a photograph do not mean that the person in the photograph is a criminal, has a criminal record, or has committed a crime involving moral turpitude.' Lockett v. State, 518 So.2d 877, 880 (Ala.Cr.App. 1987). `In Williamson v. State, 384 So.2d 1224, 1231 (Ala.Cr.App. 1980), this Court found that a photograph depicting a frontal view of the subject with a height chart in the background was not objectionable as a "mug shot."' Parker v. State, 587 So.2d 1072, 1093 (Ala.Cr.App. 1991) (death case).
 "To the extent that the photographs could be considered `mug shots,' those photographs were properly admitted into evidence.
 "`Mug shots are generally inadmissible in a criminal trial because the jury may infer from them that the defendant has a criminal history. . . . However, under certain circumstances, admitting a mug shot into evidence does not constitute reversible error.
 "`. . . The three requirements [that should be met before a mug shot is admissible are] set out in [United States v.] Harrington, [490 F.2d 487
(2d Cir. 1973):]
 "`"1. The Government must have a demonstrable need to introduce the photographs; and
 "`"2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
 "`"3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs."
 "`Harrington, 490 F.2d 487 at 494. We conclude that these three inquiries are inappropriate criteria to consider when determining the admissibility of a mug shot; however, the failure to meet one or more of these criteria would not necessarily result in reversible error. We shall still apply Rule 45, Ala.R.App.P., when deciding whether to reverse or set aside a judgment for error.'
"Ex parte Long, 600 So.2d 982, 989 (Ala. 1992). *Page 351 
 "Here, the photographs were employed to connect the appellant with the codefendants. The photographs themselves do not imply the existence of any criminal record and the prosecutor did not draw any attention to the source of the photographs when referring to the photographs during the trial."
651 So.2d at 605 (footnote omitted; emphasis in original).
The record here shows that the trial court disagreed with counsel's characterization that the presence of the lines in the photograph suggested that Tyson had a prior criminal record. Prior caselaw supports the court's ruling. See DeBruce. Also, Cardwell's identification of Tyson as the person he had seen with the victims immediately before their deaths had been attacked; thus, the State needed to rehabilitate Cardwell's testimony. Moreover, no unwarranted attention was given to the source of the photographs. There was no error in admitting the photographs into evidence.
 VII.
Tyson further argues that the trial court erred in failing to instruct the jury that its finding the existence of any mitigating circumstance did not have to be unanimous. He cites Mills v. Maryland, 486 U.S. 367,368 (1988), in support of this contention. The Mills Court held that a death sentence must be vacated when there was a "substantial probability that reasonable jurors . . . may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." Cited in Freeman v.State, 776 So.2d 160, 195 (Ala.Cr.App. 1999).
Initially, we note that this issue was not brought to the trial court's attention; thus, our review is limited to plain error. Rule 45A, Ala.R.App.P.
The appellate courts of this state have consistently held, since the United States Supreme Court's decision in Mills, that as long as there is no "reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances," there is no error in a trial court's instruction on mitigating circumstances. Freeman, 776 So.2d at 195. See also Ex parte Martin, 548 So.2d 496 (Ala. 1989), cert. denied,493 U.S. 970 (1989); Williams v. State, 710 So.2d 1276 (Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929,118 S.Ct. 2325 (1998); Brown v. State, 686 So.2d 385 (Ala.Cr.App. 1995);Rieber v. State, 663 So.2d 985 (Ala.Cr.App. 1994), aff'd, 663 So.2d 999
(Ala.), cert. denied, 516 U.S. 995 (1995); Holladay v. State, 629 So.2d 673
(Ala.Cr.App. 1992), cert. denied, 510 U.S. 1171 (1994).
A review of the trial court's instructions on mitigating evidence reflects no likelihood that the jury would have believed that before it could consider evidence in mitigation its decision had to be unanimous. No plain error occurred here.
 VIII.
Tyson also argues that the trial court erred in failing to give one of his requested jury instructions in the penalty phase. Specifically, he contends that it was error for the trial court to refuse to instruct the jury that "the deceased were involved in drug activity — an activity known to carry a risk of violence. This is a circumstance of the offense which should have been considered mitigating." (Appellant's brief at 72.) *Page 352 
When declining to give this jury instruction the trial court stated:
 "I'm reasonably sure that it . . . is inconsistent with the policies of the laws of the State of Alabama. Twenty-two is the one that says, "If you find that the victim knowingly engaged in illegal conduct, placing himself at risk of violence, you must consider that as a mitigating circumstance.' In other words, if he should have known — to say that he should have known that the defendant might shoot him in the back of the head if he was selling drugs, that's just not the kind of reasoning that we want jurors to engage in, in making this kind of a judgment. In fact, it falls at the opposite end of the spectrum from the victim-impact type information when we're assessing whether or not to apply the death penalty. It shouldn't make any difference whether it's the Queen of England or a homeless person that we're looking at who got killed. The law should be no respecter of persons and should protect each one alike. And contributory negligence is not a defense to capital murder. There would be any number of ways to argue that this is just bad policy, and I'm not going to do it. To suggest that by dealing in drugs, that a person is more or less appointing the police — the people who police those transactions informally as executioners, that's just not the policy of the law. And that would be an extremely dangerous policy, and I'm not about to give that charge."
Certainly, the requested charge does not fall within those statutory mitigating circumstances recognized in § 13A-5-51, which states:
 "Mitigating circumstances shall include, but not be limited to, the following:
 "(1) The defendant has no significant history of prior criminal activity;
 "(2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;
 "(3) The victim was a participant in the defendant's conduct or consented to it;
 "(4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;
 "(5) The defendant acted under extreme duress or under the substantial domination of another person;
 "(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and
 "(7) The age of the defendant at the time of the crime."
Tyson appears to argue that the fact that the victims were involved in drug activity should be included in § 13A-5-51(3), i.e., the victim was a participant in the defendant's conduct. However, this subsection applies in those circumstances where the victim was "an active participant in the crime underlying the killing. For instance, two people enter a bank to commit a robbery and during the robbery, one of the robbers kills the other." Jenkins v. State, 627 So.2d 1034, 1052 (Ala.Cr.App. 1992), aff'd, 627 So.2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012 (1994). Section 13A-5-51(3) has no application to the facts in this case.
Furthermore, we specifically rejected a similar argument in Dill v.State, 600 So.2d 343, 364 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924 (1993):
 "[T]he appellant seems to argue that because [the victim] was a drug dealer, the appellant should not have received *Page 353 
the death penalty. This argument likewise has no merit. The relative worth of the victim is not a consideration in determining whether to impose the death penalty. Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987)."
 IX.
Tyson further argues that the trial court erred in not allowing him to introduce an unsigned written report supporting his impeachment of a prosecution witness. During cross-examination, Jesse Cowan, Derek Cowan's father, testified that he had seen his son on the day he was killed and that his son was driving a green Honda automobile. However, he denied telling Agent Smith that he saw his son get into a car with Bernard Watson. During the cross-examination of Agent Smith, Smith testified that he had spoken with Jesse Cowan and that Cowan told him that he saw his son get into a green car with Bernard Watson. During Smith's testimony Tyson attempted to impeach Cowan by introducing a prior written statement Cowan had given to Smith, in which he said that he saw his son get into a car with Bernard Watson. The trial court would not allow Tyson to introduce the unsigned statement.
The trial court's ruling was correct. Rule 613(b), Ala.R.Evid., states: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the statement and is afforded an opportunity to admit or deny having made it." Here, the proper predicate for impeaching a witness with extrinsic evidence was not followed. Rule 613, Ala.R.Evid.[8] The trial court correctly did not allow Tyson to introduce Jesse Cowan's unsigned statement.
Furthermore, the record reflects that Jesse Cowan's testimony was in fact impeached with Agent Smith's testimony that Cowan had told him that his son had gotten into a green car with Bernard Watson on the day of his murder. If any error did occur as a result of the failure to allow the unsigned written statement into evidence, that error was harmless. Rule 45, Ala.R.Crim.P.
 X.
Tyson argues that Alabama's capital sentencing scheme is unconstitutional, because it fails to specify a measure or a standard by which the aggravating circumstances must outweigh the mitigating circumstances before a sentence of death can be imposed. This argument has been rejected previously:
 "`"We have rejected the notion that a `specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.' Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988). Equally settled is *Page 354 
the corollary that the Constitution does not require a State to ascribe any specific weight to particular facts, either in aggravation or mitigation, to be considered by the sentencer. See, e.g., Blystone v. Pennsylvania, 494 U.S. 299, 306-307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990); Eddings v. Oklahoma, 455 U.S. 104, 113-115, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982); Proffitt [v. Florida], 428 U.S. [242] at 257-258, 96 S.Ct. [2960] at 2969, 49 L.Ed.2d 913 [(1976)] (joint opinion of Stewart, Powell and Stevens, JJ.). To require that `great weight' be given to the jury recommendation here, one of the criteria to be considered by the sentencer, would offend these established principles and place within constitutional ambit micromanagement tasks that properly rest within the State's discretion to administer its criminal justice system. We therefore hold that the Eighth Amendment does not require the State to define the weight the sentencing judge must accord to an advisory jury verdict."'"
Minor v. State, 780 So.2d 707, 791 (Ala.Cr.App. 1999), quoting Smith v.State, 756 So.2d 892, 920 (Ala.Cr.App. 1998).
The process of weighing the aggravating circumstances against the mitigating circumstances in Alabama is not a numerical weighing. As § 13A-5-48 states:
 "The process . . . of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all relevant circumstances in an individual case is life imprisonment without parole or death."
Here, the trial court properly instructed the jury on the law of Alabama concerning the weighing of the aggravating and mitigating circumstances.
 XI.
Tyson further argues that the trial court's jury instructions on mitigating evidence were flawed because it failed to instruct the jury that it was required to consider certain evidence as mitigation. He asserts that the trial court's instruction that the jury "may" consider evidence as mitigation was error, because the instruction allowed the jury to chose what mitigating circumstances it would consider.
The trial court gave the following instruction on mitigating evidence:
 "A mitigating circumstance is anything about the defendant or the crime itself which in fairness should be taken into account in deciding the appropriate punishment for this defendant. Even where there is no excuse or justification for the crime, our law requires consideration of more than just the basic facts of the crime. Therefore, a mitigating circumstance may stem from any of the diverse frailties or humankind.
 "Mitigating facts are any facts relating to the defendant or any aspect of the crime itself which may be considered extenuating or reducing the defendant's moral culpability or making him less deserving of the extreme punishment of death. You may consider as a mitigating circumstance any circumstance which tends to justify the penalty of life imprisonment without the possibility of parole.
 "You must consider all evidence of mitigation. Mitigation may be established by any evidence introduced by *Page 355 
either party, the defendant's lawyer, or the prosecution at either the guilt/innocence phase of the trial or this sentencing phase or both.
 "The weight you give to a particular mitigating circumstance is a matter for your judgment. Mitigating factors are circumstances that do not constitute a defense, legal excuse, or justification for the crime, but which decrease its enormity.
 "A mitigating factor is one that can be considered as extenuating and that tends to support imposition of a sentence of life imprisonment without the possibility of parole. Mitigating circumstances are those factors or circumstances which do not constitute a justification or excuse for murder, but which in fairness should be considered in deciding between the punishment of life imprisonment without eligibility for parole and death.
 "Mitigating circumstances are anything about a defendant's life and background or about the circumstances of the offense which in fairness should be taken into account in deciding which of these two punishments should be imposed.
 "You're free to and should consider any aspect of the crime and of Anthony Tyson's background and life as a mitigator if you find it to be mitigating.
". . . .
"You must consider all evidence of mitigation."
The trial court's jury instructions on mitigating evidence were thorough and accurate. A comparison of the trial court's instructions with the Alabama Proposed Pattern Jury Instructions for Use in thePenalty Stage of Capital Cases Tried Under Act No. 81-178 reveals that the pattern instructions also contain the word "may" in association with evaluating the mitigating evidence. Although the jury must consider all evidence in mitigation, "the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer." Bush v. State, 695 So.2d 70, 89 (Ala.Cr.App. 1995), aff'd,695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969 (1997). The trial court's instructions on mitigating evidence were not erroneous.
 XII.
Last, as required by § 13A-5-53, Code of Alabama 1975, we will address the propriety of Tyson's capital murder conviction and sentence to death by electrocution. Tyson was indicted and convicted of three counts of capital murder as defined in §§ 13A-5-40(a)(2) and13A-5-40(a)(10), i.e., two counts of committing murder during the course of a robbery and one count of the murder of two or more people during one act or pursuant to one scheme or course of conduct.
The record reflects that Tyson's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section13A-5-53(b)(1).
The record further reflects that the trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances and mandated a sentence of death. The trial court found that there were no statutory mitigating circumstances present. The trial court made the following findings regarding the nonstatutory mitigating evidence:
 "1) The defense contends that the deceased knowingly engaged in conduct which would place them at risk of violence. The Court finds that this argument should not be considered as a mitigating circumstance. No one `assumes the risk' of capital murder. The policy *Page 356 
of the law cannot condone self-appointed executioners, even if the executioners were motivated by a worthy sentiment. Moreover, no evidence supports good sentiment on the part of this defendant in these killings. He killed drug dealers in order to steal the sales proceeds.
 "2) The defense contends that the defendant tried to better himself by engaging in educational courses, trade school, etc. The Court finds that this is a mitigating circumstance. However, the weight to be assigned to the defendant's self-improvement through education is minimal. Ironically, if he were totally uneducated, that would likely be argued to be a mitigating circumstance.
 "3) The defense contends that the defendant worked to support himself, and that when the defendant learned that he was to be a father, he took on extra [work] in order to better support the child once it was born. The Court finds that the fact that the defendant worked to support himself is not a mitigating circumstance. That is nature's requirement for everyone. His work record is sketchy, at best. Moreover, the fact that one defendant became excited about fathering an illegitimate child and then took on a minimal amount of extra work to support the child is not a mitigating factor.
 "4) The defense contends that the defendant maintained a good relationship with his family and the said relationship could continue should the defendant be sentenced to life imprisonment without the possibility of parole. The only family member to attend the trial was the defendant's mother. The evidence in the case was that the defendant came from a broken home, that the mother had voluntarily given primary custody of the defendant to the defendant's father when the defendant was five years of age, and that the defendant lived with his father at least until his late teens. The father was relocated to California and there was no evidence of any continuing relationship between the defendant and his father. The Court's in-court observations of the defendant's mother did not lead to the conclusion that there was a strong, wholesome relationship at the present time between the defendant and his mother. The truth is that the family relationship has little to commend itself to the Court, and the relationships in this family do not recommend themselves as a mitigating circumstance. The Court does not find this to be a mitigating factor."
The trial court found the existence of two statutory aggravating circumstances, §§ 13A-5-49(2) and 13A-5-49(4): That Tyson had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, i.e., manslaughter, attempted murder, and shooting into an occupied dwelling, and that the murders were committed during a robbery. The trial court weighed the mitigating circumstances and the aggravating circumstances and found that death was the appropriate sentence in this case. We agree with the trial court's findings.
Pursuant to § 13A-5-53(b)(2), this Court must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Tyson's sentence to death. After an independent weighing, we are convinced, as was the trial court, that death is the appropriate sentence for Tyson's conduct.
According to § 13A-5-53(b)(3) we must also address whether Tyson's sentence is disproportionate or excessive to other penalties imposed in similar capital cases. Tyson's sentence is neither disproportionate nor excessive to sentences in *Page 357 
similar cases. "In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder." McWhorter v. State,781 So.2d 257, 330 (Ala.Cr.App. 1999). See also McNair v. State,706 So.2d 828 (Ala.Cr.App. 1997), cert. denied, 523 U.S. 1064
(1998); Stephens v. State, 580 So.2d 11 (Ala.Cr.App. 1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859
(1991), rehr'g denied, 502 U.S. 1000 (1991). Last, we have searched the entire record for any error that may have adversely affected Tyson's substantial rights and have found none. Rule 45A, Ala.R.App.P.
Tyson's conviction and the sentence of death by electrocution are due to be, and are hereby, affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, BASCHAB, and FRY, JJ., concur.
[1] Tyson later pleaded guilty to attempted murder as a result of the events that occurred in Union Springs.
[2] It is clear from the record that the trial court questioned the fact that the apartment number on the warrant was incorrect. The only evidence that the apartment number was incorrect was Tyson's testimony at the suppression hearing that he lived in Apartment C, not Apartment A. Also, Officer Smith testified that he got Tyson's apartment number from the rental agreement Tyson had signed when he moved into the apartment. The Court indicated that Tyson might have switched the apartment numbers. The Court also stated the following at the end of the suppression hearing, "I conclude that the defendant basically is testifying falsely and that he is testifying in his own self interest. And I point that out because I would have extreme difficulty believing much of anything that the defendant has to say after having heard the entirety of his testimony, that of the police officers and having listened through several hours of interview."
[3] Although Copeland was decided before the adoption of the Alabama Rules of Evidence in 1996, the established caselaw on this issue was consistent with, and unaltered by the adoption of, the Alabama Rules of Evidence.
[4] Rule 404, Fed.R.Evid., is identical to Rule 404, Ala.R.Evid.
[5] A prior conviction may be proven by certified minute entries,Crittenden v. State, 414 So.2d 476 (Ala.Cr.App. 1982), or by admissions by the defendant, Kent v. State, 504 So.2d 373 (Ala.Cr.App. 1987).
[6] However, we have recognized that for purposes of the smooth operation of Rule 26.1, Ala.R.Crim.P., it is the better practice that there be a formal "adjudication of guilt." See Commentary to Rule 26.1, Ala.R.Crim.P.
[7] This section states:
 "Prior identification statements, consistent with an identifying witness' testimony, may constitute nonhearsay because they are offered, rather than to prove the truth of the matter asserted, to rehabilitate by proof of consistency. When such consistent statements are offered, however, the rehabilitating party encounters a hurdle that lies outside of hearsay law in the area of witness impeachment. This hurdle is formed by the general rule that consistent statements are admissible to rehabilitate a witness only after cross-examination has suggested that the identifying witness has recently fabricated the in-court identification or has experienced an improper influence or developed a motive to falsify the identification. If such a suggestive cross-examination is conducted against the identifying witness then a prior, consistent identification would be nonhearsay under traditional evidence law because, rather than being offered to prove the truth of the extrajudicial identification, it is offered circumstantially to show that the witness' consistency."
[8] C. Gamble, McElroy's Alabama Evidence § 157.01(2) (5th ed. 1996) states:
 "The basic reason for the requirement that the predicate question specify time, place, content of the supposed statement, and the person to whom made, is to enable the faculties of the mind of the witness to be put in motion with memory aided by the train of ideas which such circumstances would be likely to suggest in reference to the subject matter under inquiry and thereby be aided in recalling to memory whether the witness made the statement; and, if the witness recalls making it, to give an explanation of the apparent conflict between the witness' testimony and such prior statement. In a word, the requirement is a matter of fairness."