[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 841 
Sixteen-year-old Geramie Raquell Hart and his girlfriend and codefendant, Ashley Jones, planned and executed a grizzly crime that involved the murders of two members of Ashley's family and the attempted murders of two additional members. Following a jury trial, Hart was convicted of two counts of capital murder, § 13A-5-40(a)(2) and (a)(10), Ala. Code 1975, and two counts of attempted murder, §§ 13A-4-2
and 13A-6-2, Ala. Code 1975. He was sentenced to life imprisonment without parole for each capital-conviction, and he was sentenced to life imprisonment *Page 842 
for each attempted murder conviction. All sentences were ordered to run consecutively. This appeal follows.
Although Hart does not challenge the sufficiency or weight of the evidence, a brief recitation of the facts adduced at trial is helpful to an understanding of the case. Geramie Hart, who celebrated his 16th birthday a few weeks before these crimes, and his 14-year-old girlfriend, Ashley Jones, apparently planned to kill members of Ashley's family because her family did not approve of Ashley's relationship with Hart. Ashley and her 10-year-old sister, Mary Jones, lived with their grandparents, 76-year-old Deroy Nalls and 75-year-old Mary Nalls. One of Deroy and Mary's daughters and Ashley's aunt, 30-year-old Millie Nalls, also lived in the house.
Late in the evening on August 29, 1999, Deroy was in the den watching television. His wife, daughter, and younger granddaughter were asleep in their rooms. Ashley let Hart into the house; he was armed with Deroy's .38 caliber pistol, which Ashley had given him earlier. Ashley and Hart entered the den, and Hart shot Deroy twice in the face. Deroy did not die immediately; he stumbled toward the kitchen. Ashley and Hart then entered Millie's bedroom and shot her three times. She survived the gunshots, and they then hit her with portable heaters, stabbed her in the chest, and set her room on fire. The pair next entered Mary Nalls's bedroom and fired the last bullet from the gun into her shoulder. Hart was wearing a bandana over his face, but Ashley's grandmother recognized him. Hart also identified himself to Mrs. Nalls.
Ashley and Hart returned to discover that Deroy was still alive. Hart hit him with various objects and stabbed him repeatedly, leaving the knife in his back. Ashley poured charcoal lighter fluid on her grandfather and set him on fire. Ashley's sister, Mary, woke up and Ashley led her into the kitchen area. She saw her grandfather on the floor of the den; he was on fire but still alive, Mary said. Hart forced Deroy Nalls to disclose where he kept his money, and after Mr. Nalls complied, Hart stabbed him in the throat. Mrs. Nalls who survived after being stabbed, could not remember whether Hart or Ashley had stabbed her. Ashley poured the charcoal fluid on Mrs. Nalls, then they set her on fire. Ashley and Hart watched Mrs. Nalls burn, and Hart urged Ashley to pour more of the flammable liquid on her. Mary Jones attempted to leave the kitchen, but Ashley grabbed her sister and began hitting her. Hart pointed the gun at the 10-year-old and said, "This is how you are going to die." (R. 686.) Ashley said, "No, let me do it," and stabbed her sister 14 times. Hart and Ashley piled sheets, towels, and paper on the floor and set the pile on fire.
Hart and Ashley took $300 that was hidden beneath Deroy and Mary Nalls's mattress and drove away in the Nallses' vehicle. Mary Jones, who had pretended to be dead, helped her grandmother out of the house and contacted others for assistance.
The coroner determined that Deroy and Millie Nalls died from the stab and gunshot wounds they sustained. He testified that both victims suffered greatly from their wounds before they died. Mary Jones was treated for the numerous stab wounds Ashley inflicted. Mary Nalls, who sustained burns to 35% of her body, was taken to a burn unit, where she was also treated for the gunshot and stab wounds she suffered. She was hospitalized for weeks, received skin grafts, and underwent extensive rehabilitative therapy.
Hart and Ashley Jones were arrested the next morning in a hotel room. The Nallses' vehicle was in the parking lot of *Page 843 
the hotel. Hart and Jones gave voluntary statements describing their involvement in the murders and attempted murders of Jones's family members.
 I.
Hart first argues that the trial court erred when it denied his second motion for a continuance. In his motion to continue, defense counsel argued that he was not prepared for Hart's trial because he had been involved in another capital-murder trial the week before. This Court has previously discussed review of a trial court's denial of a request for a continuance:
 "`The trial court has broad discretion in granting a continuance when the basis for the motion is that counsel has not had sufficient time to prepare or to develop his defense. Godfrey v. State, 383 So.2d 575, 577 (Ala.Cr.App.), cert. denied, 383 So.2d 579
(Ala.), cert. denied, 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980), citing Smith v. State, 282 Ala. 268, 210 So.2d 826 (1968). "A motion for a continuance due to a lack of time for adequate preparation is a matter entirely and exclusively within the sound discretion of the trial court and its ruling will not be reversed on appeal absent a . . . showing of abuse." Reynolds v. State, 539 So.2d 428, 429 (Ala.Cr.App. 1988), cert. denied, 539 So.2d 428 (Ala. 1989). Moreover, "the reversal of a conviction because of the refusal of the trial judge to grant a continuance requires 'a positive demonstration of abuse of judicial discretion.' Clayton v. State, 45 Ala. App. 127, 129, 226 So.2d 671, 672 (1969)." Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.), writ denied, 372 So.2d 44
(Ala. 1979) (emphasis added).'
 "Loggins v. State, 771 So.2d 1070, 1084
(Ala.Crim.App. 1999)."
Smith v. State, 797 So.2d 503, 523 (Ala.Crim.App. 2000).
The record indicates that Emory Anthony was appointed on October 4, 1999, to represent Hart. Hart was indicted on January 14, 2000, and trial was set for October 30, 2000. Defense counsel filed a motion to continue on October 24, 2000. The motion was granted, and trial was reset for June 4, 2001. On May 31, 2001, Anthony filed a "Motion to Continue or in the Alternative Motion to Withdraw," alleging that he had been involved in another capital-murder trial since May 21, 2001, and that he would not be physically or mentally prepared to begin Hart's capital defense in four days. The trial court denied the motion on the same day.
On the morning of trial, an extensive motions hearing was held. Anthony and his cocounsel were present and both actively participated in the hearing, discussing both legal issues and facts relevant to the case. We observe, furthermore, that defense counsel had filed numerous extensive motions and requests before trial, indicating their regular involvement in and preparation for Hart's trial defense. Anthony participated in voir dire questioning, presented the opening and closing arguments, and cross-examined many of the State's witnesses. All indications are that Anthony and his cocounsel represented Hart's interests zealously throughout trial.
Nothing in the record warrants a determination by this Court that the trial court abused its broad discretion when it denied defense counsel's request for a continuance, which was filed just days prior to trial. There being no abuse of judicial discretion, Hart is not entitled to any relief on this claim.
 II.
Hart next claims that the trial court erred when it refused to allow him to *Page 844 
make a proffer of evidence. Hart apparently believed it was necessary to make a proffer because, he claims, the trial court unfairly limited his cross-examination of Sgt. Jerry Frazier. Specifically, Hart attempted to ask Sgt. Frazier about a statement made by another officer (Sgt. Hadder) in a preliminary hearing in this case, and the trial court refused to allow that line of questioning. When Hart later attempted to place the preliminary hearing testimony of Sgt. Hadder into the record to preserve the issue for appeal, the trial court refused to allow Hart to put that portion of the transcript into the record. No error occurred with regard to the trial court's rulings.
 "The general rule is that if a trial court excludes evidence offered by a defendant, it is the defendant's responsibility to make an offer of proof to preserve for appellate review any error in the trial court's refusal to accept the evidence. However, if the substance of the evidence sought to be admitted is apparent from the context within which the questions were asked, no offer of proof is necessary."
Myers v. State, 601 So.2d 1150, 1152 (Ala.Crim.App. 1992).
It is clear from the record that, during the hearing on Hart's motion to suppress his statement, Hart sought to question Sgt. Frazier about the testimony offered by Sgt. Hadder at Hart's preliminary hearing. It is also clear that Sgt. Hadder testified at the previous hearing that Hart was not wearing a shirt while he was detained. Because the substance of the evidence Hart sought to admit was apparent, no offer of proof was necessary. Therefore, the trial court did not err when it denied Hart's request to make an offer of proof regarding Sgt. Hadder's testimony from the earlier proceeding.
Moreover, we find no error in the trial court's resolution of the underlying issue; the trial court properly precluded Hart from questioning Sgt. Frazier about testimony offered by Sgt. Hadder at the preliminary hearing.
 "It is well settled that '[a] party is entitled to a thorough and sifting cross-examination of the witnesses against him,' McMillian v. State, 594 So.2d 1253, 1261 (Ala.Crim.App. 1991), remanded on other grounds, 594 So.2d 1288 (Ala. 1992), opinion after remand, 616 So.2d 933 (Ala.Crim.App. 1993), citing Perry v. Brakefield, 534 So.2d 602 (Ala. 1988), and § 12-21-137, Ala. Code 1975, and that a party should be given `wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge.' Williams v. State, 710 So.2d 1276, 1327 (Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). It is equally well established, however, `that the latitude and extent of cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse.' Long v. State, 621 So.2d 383, 388
(Ala.Crim.App. 1993), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993), quoting Beavers v. State, 565 So.2d 688, 689 (Ala.Crim.App. 1990)."
Reeves v. State, 807 So.2d 18, 38 (Ala.Crim.App. 2001).
During direct examination at the suppression hearing, Sgt. Frazier, who was present when Hart gave his statement, testified that Hart was wearing an undershirt and shorts when he was detained. On *Page 845 
cross-examination, defense counsel noted that Sgt. Hadder had testified at Hart's preliminary hearing; defense counsel stated, "I am going to let you look at this, to refresh your memory." (R. 1085.) The prosecutor objected because defense counsel attempted to show Sgt. Hadder's testimony to Sgt. Frazier to refresh his recollection, and the trial court sustained the objection. Defense counsel continued his cross-examination:
 "Q: So, if Detective Hadder said that he didn't have a shirt on, she would be incorrect. If she said that, at the preliminary hearing, that Mr. Hart didn't have a shirt on, she would be incorrect.
 "A: I said to the best of my knowledge, he had on an undershirt. Now if Sergeant Hadder recalls he didn't have on an undershirt, that's — that's her."
 "Q: Alright. But we know he didn't have on shoes. We know he had on socks. Well, no socks, short pants, and — and you don't know whether he had a t-shirt on.
"A: Undershirt.
"Q: Undershirt."
(R. 1085-86.)
We addressed a similar issue in Tyson v. State, 784 So.2d 328
(Ala.Crim.App. 2000), when defense counsel attempted to introduce a witness's prior statement into evidence during the testimony of a second witness, a law-enforcement officer. The trial court refused to admit the statement into evidence. We held:
 "The trial court's ruling was correct. Rule 613(b), Ala. R. Evid., states: `Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the statement and is afforded an opportunity to admit or deny having made it.' Here, the proper predicate for impeaching a witness with extrinsic evidence was not followed. Rule 613, Ala. R. Evid. The trial court correctly did not allow Tyson to introduce Jesse Cowan's unsigned statement.
 "Furthermore, the record reflects that Jesse Cowan's testimony was in fact impeached with Agent Smith's testimony that Cowan had told him that his son had gotten into a green car with Bernard Watson on the day of his murder. If any error did occur as a result of the failure to allow the unsigned written statement into evidence, that error was harmless. Rule 45, Ala.R.Crim.P."
784 So.2d at 353 (footnote omitted).
Our resolution of this case is based on the reasoning applied inTyson. As was the case in Tyson, Hart could not impeach a witness with a previous statement because the person who made the statement was not on the stand and was not confronted with the statement.[1] Rule 613, Ala. R. Evid. The trial court did not abuse its discretion when it refused to allow Hart to question Sgt. Frazier about the other officer's prior testimony.
Finally, as the above-quoted portion of Sgt. Frazier's testimony demonstrates, Hart was able to present his assertion that Sgt. Hadder had testified previously that Hart was not wearing a *Page 846 
shirt. Therefore, even if any error had occurred in the trial court's ruling, and we conclude that none occurred, the error would have been harmless. Rule 45, Ala.R.App.P.
Based on the foregoing, Hart's claim is meritless, and he is not entitled to any relief.
 III.
Hart next claims that the trial court erred when it denied his motion to suppress the statement he gave to police because, he says, the statement was made under duress. Hart alleges that his detention in a cold room and the police officers' failure to seek adequate clothing or a blanket in response to his request constituted duress.
 "In Richardson v. State, 819 So.2d 91 (Ala.Crim.App. 2001), this Court stated:
 "`The fundamental requirements for voluntariness of confessions are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him. The test is whether, considering the totality of the circumstances, law enforcement officials have overborne the will of the accused. The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure.'"
Baird v. State, 849 So.2d 223, 230-31 (Ala.Crim.App. 2002) (citations omitted).
In reviewing decisions concerning the suppression of evidence, we apply a de novo standard of review when the evidence is not in dispute. Statev. Keller, 822 So.2d 483, 485 (Ala.Crim.App. 2000). Sgt. Jerry Frazier was the only witness at the hearing on the motion to suppress. Therefore, the evidence is not in dispute and we apply a de novo standard of review.
Regarding the temperature of the room in which Hart was detained, Sgt. Frazier testified that before Hart agreed to give a statement, he once told the officers that he was cold. Sgt. Frazier testified, "We looked around to see if we had something that we could give him to put on. We didn't have anything there." (R. 1076.) The officer testified that he told Hart that they were not able to find anything for him to put on, that they were waiting for his mother to arrive, and that as soon as his mother arrived, they would take care of it. Hart was wearing an undershirt and shorts, according to the officer. Sgt. Frazier further stated that the room was not any colder than any other in the building. Before Hart's mother arrived, Hart told the officers that he wanted to talk to them, and he gave a statement. Sgt. Frazier did not recall Hart telling him that he was too cold and that Hart indicated that he wanted to "go ahead and get this over with, without his mother." (R. 1089.)
After Hart informed the officers that he wanted to make a statement, the officers again informed Hart of his juvenile Miranda rights and told him that his mother had been contacted and that she was on her way. The officers did not promise him anything for making a statement, nor did they threaten him. Hart appeared to understand his rights, and he signed a form waiving those rights. Hart's mother arrived after the interview began. The officers read Hart his rights in his mother's presence and asked his mother if she had any questions. She then signed the waiver form and the interview continued.
Sgt. Frazier testified that Hart did not appear to be shaking or shivering from the cold during the interview. He was permitted *Page 847 
to use the restroom when he requested to do so. He was detained for approximately two hours before the officers first spoke with him, and he declined to make a statement until his mother arrived. Hart initiated contact with the officers approximately two hours later and indicated that he wanted to make a statement even though his mother had not yet arrived.
Nothing in the record supports Hart's assertion that the temperature of the room and the clothing he was wearing created coercive circumstances that rendered his statement involuntary. Even though the evidence indicated that Hart had complained about the temperature and had asked for additional clothing, nothing in the record indicates that the temperature influenced his decision to make a statement, or that his will was somehow overborne by the temperature.[2] The trial court did not err in rejecting this claim and in denying the motion to suppress on this ground. Moreover, we find that the remaining circumstances surrounding Hart's detention and questioning, discussed above, would not support any additional claims that the statement was involuntary.
Our review of the evidence presented leads us to conclude that the claims raised in Hart's motion to suppress were not substantiated and that the trial court correctly denied the motion to suppress. No error occurred as a result of the admission of Hart's statement, and Hart is not entitled to any relief on this claim.
 IV.
Hart next argues that the trial court erred in denying his motion for a judgment of acquittal, which was based on the State's alleged failure to "preserve evidence (a urinalysis from Hart) previously ordered by the District Court Judge when Hart was arrested." (Hart's brief at 29-30.) This specific claim was not presented to the trial court; it is therefore not properly before this Court for review.
After the State presented its case to the jury and rested, Hart made a motion for a judgment of acquittal that challenged the sufficiency of the evidence. The trial court denied the motion. Hart then made a second motion for a judgment of acquittal. In this motion, Hart alleged that, on September 1, 1999, pursuant to a request from defense counsel, the district court ordered an immediate drug analysis. Defense counsel informed the trial court that they believed that "somewhere in the vicinity of the incident" Hart had ingested a powerful drug, perhaps heroin. (R. 1157.) Hart asserts in his brief to this Court that "the paperwork was taken immediately to the Jefferson County Jail once the order was made." (Hart's brief at 32.) Contrary to Hart's assertion in his brief, the record suggests that the paperwork was never delivered to the sheriff's office, and the parties agreed at trial that no drug test was ever performed. Therefore, Hart's assertion on appeal that the State failed to "preserve evidence" was not raised at trial and is being raised for the first time. Only those specific claims presented to the trial court are properly raised for review on appeal. Grays v. State,782 So.2d 842, 844 (Ala.Crim.App. 2000). Because no drug test was ever performed, Hart could not and did not argue at trial that the State failed to preserve evidence. Therefore, this claim is not subject to review. Moreover, even if the claim had been preserved, it would be *Page 848 
baseless, because no drug testing was ever performed and no evidence was ever obtained.
To the extent Hart is arguing that the State failed to ensure that the drug test was performed, he is entitled to no relief. First, the claim was not timely raised. The trial court questioned defense counsel about their actions after they received the district court's order for the drug test, and defense counsel acknowledged that they did nothing to follow up on the order until some unspecified amount of time had passed. Furthermore, the trial court ascertained that defense counsel failed to raise the matter until after the State had presented its case to the jury. The court noted that defense counsel did not raise the issue when Hart applied for youthful-offender status or when Hart was arraigned or in any pretrial motions. Defense counsel stated that they thought it was proper to raise the matter at trial because it was a due-process violation. The prosecutor stated that she had not seen the motion or the order, and that she first became aware of them "a couple of months ago" when defense counsel contacted her about the drug test. (R. 1168.) The trial court denied the motion.
This Court has repeatedly held that timely objections are required to preserve an assignment of error for appellate review, and that the objection should be made as soon as the objectionable ground becomes apparent. E.g., Perkins v. State, 715 So.2d 888, 894 (Ala.Crim.App. 1997). As the trial court's pointed questions to defense counsel clearly indicated, a timely objection was not made in this case. Therefore, no error regarding the alleged failure to secure the drug analysis was preserved for this Court's review.
Based on the foregoing, Hart is not entitled to any review of, or relief on, this claim of error.
 V.
In his final issue, Hart argues that the trial court erred when it denied him the right to thoroughly cross-examine Mary Jones about Ashley Jones's participation in the crimes. Hart has failed to provide this Court with any citations to the parts of the record relied on in support of this claim, as required by Rule 28(a)(10), Ala.R.App.P. Hart's appellate counsel states:
 "Hart's attorney attempted to elicit from Mary Jones testimony regarding statements made at the juvenile hearing of Ashley Jones. The state had previously filed a motion in limine that prevented any statements to be made concerning what Ashley Jones said."
(Hart's brief at 35.) Appellate counsel has failed to cite to portions of the record containing the State's motion in limine, any hearing or trial court ruling on the motion in limine, or the portions of Mary Jones's testimony where he was allegedly precluded from examining her on this matter. By failing to include any citations to the record on this issue, Hart has failed to comply with Rule 28(a)(10), Ala.R.App.P., and has waived this claim for purposes of appellate review. E.g., Hamm v. State, [Ms. CR-99-0654, Feb. 1, 2002] ___ So.2d ___ (Ala.Crim.App. 2002).
Moreover, we have reviewed defense counsel's cross-examination of Mary Jones (R. 700-24), and we have found only one instance in which the trial court sustained an objection made by the prosecutor (R. 723). It appears that defense counsel was attempting to impeach Mary's testimony that Hart pointed a gun at her and said, "This is how you are going to die," by eliciting testimony that Mary had not testified to that statement at Ashley Jones's transfer hearing. The prosecutor objected on grounds that Mary had not *Page 849 
made an inconsistent statement at the transfer hearing, but that if counsel had a contradiction, that was appropriate to use. The trial court sustained the objection; defense counsel did not pursue that question further. However, defense counsel then asked Mary whether, in her statement to the police, she had said that Hart told her, "This is how you are going to die," and Mary said that she had not. Defense counsel also elicited from Mary testimony that she believed that one's memory is better immediately after an event than after time passes. (R. 723.) Therefore, even if Hart had properly presented this claim for our review — and he did not — he would not be entitled to any relief because the jury heard the substance of the testimony he had earlier attempted to elicit from Mary and to which the prosecutor objected. Even if the trial court had erred in sustaining the prosecutor's objection, the error would have been harmless. Rule 45, Ala.R.App.P.
Based on the foregoing, Hart's convictions and sentences for two counts of capital murder and two counts of attempted murder are affirmed.
AFFIRMED.
McMillan, P.J., and Shaw and Wise, JJ., concur. Baschab, J., concurs in the result.
[1] Hart argued at trial that Sgt. Hadder's prior testimony was offered to refresh Sgt. Frazier's memory. Rule 612, Ala. R. Evid. We note, however, that Sgt. Frazier's memory was not exhausted. Rather, Sgt. Frazier's testimony differed from Sgt. Hadder's testimony, and Hart sought to challenge Sgt. Frazier's testimony and recollection of events with the prior testimony of another witness. Therefore, although Hart argued otherwise at trial, his attempt to use the prior testimony of Sgt. Hadder was actually an improper attempt to impeach Sgt. Frazier.
[2] We have listened to the tape recording of Hart's confession, and observed that Hart did not refer to the temperature in any way. His responses to questions were clear and understandable, and give no indication of any duress. *Page 850